COMMONWEALTH OF PENNSYLVANIA and Richard W. Baumann, Joseph Blume, James Mages and Bernard W. Peitz, Jr., Individually and on behalf of all others similarly situated

v.

James D. PORTER, Chief of Police; Borough of Millvale; Frank L. Baranyai, Borough of Millvale Police Officer; Regis J. McCarthy, Mayor of the Borough of Millvale; Carl Seidl, President of the Millvale Borough Council; Maurice P. Bedel, Sr., James Beran, John L. Cavanaugh, Jerry Dawson, James H. Lawson and Stephen Mikus, Members of the Millvale Borough Council.

Appeal of Frank L. BARANYAI, in No. 79–2653.

Appeal of Regis J. McCARTHY, et al., in No. 79–2684.

Appeal of James D. PORTER, in No. 79–2685.

Nos. 79–2653, 79–2684 and 79–2685.

United States Court of Appeals, Third Circuit.

Argued Oct. 6, 1980.

Reargued May 12, 1981.

Decided July 30, 1981.

As Amended Aug. 5, 1981.

Daniel J. Weis, Weis & Weis, Bruce E. Dice (argued), Zimmer & Dice, Pittsburgh, Pa., for appellants James D. Porter and Frank L. Baranyai.

Alfred C. Maiello, Pittsburgh, Pa. (argued), for appellants Mayor and Members of the Council of the Borough of Millvale.

Paul D. Boas (argued), Berlin, Boas, Isaacson & Logan, Pittsburgh, Pa., for appellees Baumann, Blume, Mages and Peitz, Jr.

Frank P. Tuplin, Sp. Deputy Atty. Gen., Pittsburgh, Pa. (argued), for appellee Commonwealth of Pa.

Elizabeth M. Schneider (argued), Frank Askin, Constitutional Litigation Clinic, Newark, N. J., Charles S. Sims, Bruce J. Ennis, Jr., American Civil Liberties Union Foundation, New York City, for amici curi-

ae The American Civil Liberties Union and the Greater Pittsburgh Chapter of the American Civil Liberties Union.

Argued Oct. 6, 1980.

Before ALDISERT, GARTH and VAN DUSEN, Circuit Judges.

Reargued In Banc May 12, 1981.

Before SEITZ, Chief Judge, and ALDISERT, ADAMS, GIBBONS, HUNTER, GARTH, HIGGINBOTHAM and SLOVITER, Circuit Judges.

### OPINION OF THE COURT

PER CURIAM, announcing the judgment of the court:

To the extent the injunction of the district court is directed to the members of the Borough Council it will be reversed. In all other respects the judgment of the district court will be affirmed. Because neither appended opinion commands in its entirety a majority of the members of the court, their positions are noted as follows:

Judges Higginbotham and Sloviter join in Judge Gibbons' opinion in its entirety.

Chief Judge Seitz, and Judge Adams, because of the unusual factual situation present here, join in the conclusions reached in Judge Gibbons' opinion except as to part IV(D) dealing with the Borough Council. As to the Borough Council, they join in the conclusion reached in part IV of Judge Garth's opinion.

Judges Aldisert and Hunter join in Judge Garth's opinion in its entirety.

Costs to be taxed against Appellant Baranyai in No. 79–2653.

One-half the costs to be taxed against the Appellees and one-half the costs to be taxed against Appellant McCarthy in No. 79–2684.

Costs to be taxed against Appellant Porter in No. 79–2685.

GIBBONS, Circuit Judge, with whom HIGGINBOTHAM and SLOVITER, Circuit Judges, join fully, and with whom Judges SEITZ, Chief Judge, and ADAMS, Circuit Judge, join except for Part IV(D).

Frank L. Baranyai, a policeman, Regis J. McCarthy, Mayor, James D. Porter, Police Chief, Carl Seidl, President of the Borough Council, and six other council members, all of the Borough of Millvale, Pennsylvania appeal from a final injunction issued in an action brought by the Commonwealth of Pennsylvania and three individual plaintiffs, charging that Baranyai, with the instigation, acquiescence and ratification of the Mayor and Council, engaged in an extended pattern or practice of conduct denying persons lawfully in Millvale their constitutional rights to be free from physical violence, mistreatment, threats, harassment, illegal detention, illegal arrests, and illegal searches and seizures. Each defendant, for different reasons, contends that no injunctive relief should have been granted against him.

I

The Borough of Millvale is a small municipality in Allegheny County organized under the Pennsylvania Borough Code. 53 P.S. § 45101 et seq. That code vests in the Borough Council power to enact ordinances not inconsistent with the laws of the Commonwealth. 53 P.S. 46006(3). The Code also provides that it shall be the duty of the Mayor "[t]o preserve order in the borough, to enforce the ordinances . . . [and] to exact a faithful performance of the duties of the officers appointed . . . ." 53 P.S. 46029(1). Borough Councils are authorized "to appoint and remove, or suspend, or reduce in rank, one or more suitable persons . . . as borough policemen." 53 P.S. 46121. Moreover "[t]he borough council may designate one of said policemen as chief of police." *Id.* The Mayor of the Borough "shall have full charge and control of the chief of police and the police force, and he shall direct the time during which, the place where and the manner in which, the chief of police and the police force shall perform their duties . . . ." *Id.* While Section 46121 vests ultimate power of removal or suspension of policemen in the Borough Council, the Mayor may suspend any policeman for cause until the Council's next regular meeting.

53 P.S. § 46124. Thus the Mayor of a Pennsylvania borough is its chief law enforcement officer, charged with the responsibility of supervising the manner in which the police department functions, with ample authority to control the conduct both of the chief of police and of all police officers. Together, the Mayor and the Council exercise close control over Borough Police Force personnel.

■ 53 P.S. § 46190 lists specific reasons for suspension or removal of policemen. Among those reasons are "violation of any official duty", besides the commission of a misdemeanor or a felony, "inefficiency, neglect, intemperance, immorality, disobedience of orders, or conduct unbecoming an officer." Anyone acting in an official capacity in Pennsylvania, including a policeman, commits a misdemeanor if, knowing his conduct is illegal, he subjects another to arrest, detention, search, seizure, mistreatment or other infringement of personal or property rights; or denies or impedes another in the exercise of any right, privilege, power or immunity. 18 Pa.C.S.A. § 5301.

In 1911, the Borough of Millvale passed an ordinance, No. 305, never amended nor repealed, defining disorderly conduct. (Joint Exhibit B). Disorderly persons include "[a]ll persons persisting in loitering upon the public highway or streetcorners and in front of any store, shops, places of business, place of amusement or place of worship after being requested to vacate such place or places and move on," "[a]ll habitual street or corner loafers," and "[a]ll suspicious persons or person who can give no reasonable account of themselves."

In the summer of 1973 the Council hired Baranyai as a policeman. In August of 1974 the Council at a meeting attended by the Mayor, received the first of a long series of citizen complaints about Officer Baranyai's behavior in that capacity. On that occasion three persons complained of verbal abuse or harassment. (Plaintiff's Exhibit 1). Subsequent complaints of more serious misconduct by Baranyai were made, and these eventually came to the attention of Community Advocate Unit of the Attorney General's office in Pennsylvania. That office conducted an investigation which resulted in the filing of criminal charges against Baranyai in the Court of Common Pleas of Allegheny County on July 14, and July 18, 1977. Those charges were called to the attention of the Council, the Mayor, and the Chief of Police, but Baranyai, nevertheless, was continued as a policeman dealing with the public. Indeed, after it learned of the Commonwealth's decision, the Council passed a resolution supporting Baranyai's conduct.[1]

On October 6, 1977 the Community Advocate Unit of the Attorney General's Office filed the complaint in this action, seeking preliminary and permanent injunctive relief prohibiting the defendants from subjecting residents of Millvale and others lawfully in Millvale from unconstitutional physical violence, mistreatment, threats, or harassment; from unconstitutional detention, searches, seizures, arrests and imprisonment; and from interference with the free exercise of their rights. The complaint alleges a course of conduct by Baranyai in violation of rights protected by the United States Constitution. It charges Baranyai with illegal arrests, illegal searches and seizures, excessive use of force, beatings of persons in custody, and intimidation of persons who would complain or testify against him. It alleges that the Council members, the Mayor and the Chief of Police, each of whom could exercise control over Baranyai, having full knowledge of this course of conduct, and of the danger he posed to all with whom he comes in contact during the course of his employment as a policeman, purposefully, unreasonably, and in bad faith refused to suspend, transfer, or otherwise limit his activities; publicly condoned and approved his unconstitutional actions; and in some instances intimidated or attempted to intimidate persons who would testify or complain against him.

---

1. Similarly, within a week of Baranyai's Feb. 8, 1978 conviction of simple assault and official oppression in Allegheny County Court of Common Pleas, the Council, on Feb. 14, passed another resolution supporting Baranyai.

The defendants responded to the complaint by filing a motion to dismiss. They pressed two principal grounds in support of that motion: (1) that the Commonwealth of Pennsylvania was not a proper plaintiff; and (2) that on the authority of *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) the complaint failed to state a claim upon which any injunctive relief could be granted. On February 24, 1978 the district court denied the motion unconditionally insofar as it relied on *Rizzo v. Goode*. The court also denied it insofar as it contested the Commonwealth's standing as a plaintiff, provided that within 20 days the Commonwealth filed an amended complaint joining as plaintiffs individuals whose rights are claimed to have been violated. An amended complaint was filed in which four individual plaintiffs were joined, and requested class action relief. The defendants responded to the amended complaint by a motion to strike, this time contending that all persons whose rights were violated would have to be joined, that the Commonwealth could not act on behalf of non-party victims of Baranyai's actions, that the four individual plaintiffs had an adequate remedy at law, and that a class action was improper. The motion to strike was denied. Thereafter the individual plaintiffs moved for a class action certification.

This motion was denied:

> for the reason that the Commonwealth of Pennsylvania as *parens patriae* is representing the citizens of the State generally in this action and if there is further need for class action which may later appear in this case plaintiff's [sic] may move at that time for reconsideration of the same.

Order of September 6, 1978, 2528a. *See also Commonwealth of Pa. v. Porter*, 480 F.Supp. 686, 695 (W.D.Pa.1979).

A non-jury trial of the action began on April 23, 1979. The court heard testimony from 61 witnesses over 14 days, and received in evidence voluminous exhibits. The trial court made extensive findings of fact, many of which involved credibility determinations about disputes in testimony between the witnesses offered by the plaintiffs and those offered by the defendants. The court's ultimate conclusion, based upon those extensive findings, is that "Baranyai has engaged in a pattern of [sic] practice denying citizens residing in and otherwise lawfully in the Borough of Millvale, Allegheny County, their rights to be free from physical violence, mistreatment, threats, harassment, illegal detention, illegal arrest and illegal searches and seizures." [2] As to the Chief of Police, the court found:

> The evidence indicates that despite complaints Porter never found fault with Baranyai pertaining to the charges. He took no action to discipline him after he was convicted in criminal court of malfeasance in office, he has publicly supported Baranyai in all instances, he could not give a single instance of a report of an investigation to the complainant, and he retaliated against other officers, viz: Cepek, Fisinger, Pfeifer and Snyder who testified or otherwise complained relative to Baranyai's conduct.[3]

As to the Mayor, the court found:

> The evidence in the case is that Mayor McCarthy instigated the police department in using broad powers under Ordinance No. 305 of 1911 to move people off the street who were doing nothing and not obstructing passage and to arrest them upon failure to move at the officer's whim.... Mayor McCarthy was in receipt of numerous complaints relative to Baranyai's conduct both in and outside council meetings but he found that all complaints were unjustified. Any investigation made was, as previously found by this court, perfunctory in nature only and consisted of asking Chief Porter or Officer Baranyai whether there was any basis for the complaint.

> Mayor McCarthy has publicly stated that: "As long as I am Mayor, I will not suspend Frank Baranyai from the Millvale

---

2. *Commonwealth of Pa. v. Porter*, 480 F.Supp. 686, 692 (W.D.Pa.1979).

3. 480 F.Supp. at 701.

Police Force." He also participated in the retaliation against other officers who testified or complained relative to Baranyai. We therefore find that he is causally linked to this pervasive pattern of violation of constitutional rights and is subject to relief under *Rizzo v. Good[e]*, *supra*, that he is causally linked to police abuse and that practices in this case certainly rise to a custom or usage which is actionable under 42 U.S.C. § 1983.[4]

As to the Council the court found:

... the evidence shows that citizens soon learned that complaints to the Borough Council were useless. The Borough Council itself has, however, taken an active part in the Baranyai affair. It twice adopted resolutions supporting Baranyai's conduct on July 12, 1977 (Plaintiff's Ex. 15) and on February 14, 1978 (Plaintiff's Ex. 12).

Notwithstanding that Baranyai was convicted on criminal charges against him and this case was filed on October 5, 1977, the Borough Council has nevertheless refused to take further action. Two members of the Borough Council who endeavored to induce it to do something about the situation and exercise its powers were voted down by a vote of 5 to 2 and were subject to personal abuse.

· · · · ·

Beginning in 1975, the Borough Council began to get complaints about the conduct of Officer Baranyai and notwithstanding the verdict of guilty in the criminal cases and the bringing of this suit has failed to make any investigation or take any steps toward removing or suspending him. This is not a case like *Rizzo* depending on statistical proof. The proof here pinpoints violations by one police officer against individual citizens who have appeared on the stand and complained. The police officer is a defendant here as well as the other borough officials who are involved in this unhappy proceeding and whose actions have encouraged Baranyai in further violations ...

We find this course of conduct on the part of Baranyai encouraged and supported by the other defendants in this case will continue unless some restraint is exercised by the court.[5]

Summarizing, the Court said:

Under these circumstances we have no hesitation in finding that all the defendants in this case were causally linked to the police abuse by Officer Baranyai, that there was a pervasive pattern of support for him and his misconduct and this amounts to a custom and usage under 42 U.S.C. § 1983 and *Monell, supra.*[6]

The court entered a permanent injunction the relevant provisions of which are set forth in the margin.[7] This appeal followed.

---

4. 480 F.Supp. at 702.

5. 480 F.Supp. at 702–03.

6. 480 F.Supp. at 703.

7. (1) A permanent injunction is hereby issued against the defendant Frank L. Baranyai and all persons acting in concert with him enjoining him from (a) stopping, arresting or imprisoning plaintiffs or other individuals without adequate probable cause, (b) physically abusing or otherwise treating plaintiffs or other individuals, (c) using wrongful or excessive force while bringing about lawful arrests or in otherwise handling individuals arrested after they have been secured in custody.

(2) The defendant Baranyai together with the defendants James D. Porter, Chief of Police and Regis J. McCarthy, Mayor of the Borough of Millvale, Allegheny County are enjoined and restrained from harassing, threatening, intimidating or retaliating against the plaintiffs or other individuals in violation of their First and Fourteenth Amendment rights of speech, assembly and association and their right to equal protection of the laws and their constitutional right to travel for lawfully complaining against the conduct of defendant Baranyai or testifying at trials or hearings involving his conduct.

(3) The defendant Baranyai is restrained from stopping, seizing and searching plaintiffs or other individuals on the streets whether in the Borough of Millvale or elsewhere, in their homes or otherwise without adequate cause in violation of their First and Fourteenth Amendment rights and to freedom from unreasonable searches and seizures and in violation of their rights not to be deprived of property without due process of law.

(4) All of the defendants are enjoined from further engaging in conduct as enjoined

## II

■ ·The defendants have advised us that while the appeal was pending Baranyai left the employ of the Borough of Millvale, taking a job as a policeman in another Pennsylvania community. They suggest that this development renders the entire case moot, and requires that we enter a judgment vacating the district court's judgment.[8] The Commonwealth disagrees. It points out that Baranyai is still functioning as a policeman, and that the pattern or practice of police misconduct which the court found he had engaged in may, if not enjoined, continue in another part of Pennsylvania. The Commonwealth is as interested in preventing police misconduct throughout Pennsylvania as in Millvale. Moreover the Commonwealth urges that the case involves not only Baranyai's abuses, but also the encouragement of those abuses by the Mayor, the Police Chief, and the Borough Council. For example, it cannot be said with certainty that those defendants will not in the future encourage the same misuse of ordinance No. 305 in which the court found they encouraged Baranyai. Finally, the Commonwealth points out that we have no assurance that absent the injunction Baranyai himself would not be rehired. In these circumstances we cannot say with assurance that there is no reasonable expectation that the alleged violations will recur, or that Baranyai's change in position has completely and irrevocably eradicated the effects of the pattern or practice the court found. *See County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979). This is not a case like *DeFunis v. Odegaard,* 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974) in which the interest of a single plaintiff is involved and he has achieved everything a judgment could afford him. Nor is it a case in which we are reviewing a preliminary judgment which by standards applicable to pendente lite relief might be moot. *University of Texas v. Camenisch,* 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). We review a final injunction protecting a broad class. The merits of that final injunction must be considered.

## III

All of the defendants contend that the trial court erred in refusing to dismiss the Commonwealth as a plaintiff. At first blush one may wonder why, since there are individual plaintiffs in the case in any event, so much time, effort and space has been devoted to this issue. What the defendants are seeking, however, is a result which will, without reaching the merits of most of the case, bring about an effective dismantling of the injunction. They argue that the individual plaintiffs were not designated as class representatives, and thus that any injunction could only run to plaintiffs' individual benefit, not to the benefit of others who in the future may happen to encounter Officer Baranyai, the Millvale police department, and other Millvale municipal officials. Thus, the defendants hope, our review will be confined to evidence of Baranyai's actions regarding the

above or from encouraging, affirming, or participating in violations of this injunction by Baranyai.

(5) All of the defendants are hereby enjoined effective 5 days from the date of this order from employing defendant Baranyai and Baranyai is enjoined from serving as a police officer or law enforcement official on any basis in the Borough of Millvale except as a desk policeman whose activities shall be entirely confined to the police station of the Borough of Millvale and he is further enjoined from possessing or using upon prisoners or other persons any weapons of any kind, particularly without limiting the generality of the foregoing any blackjack, nightstick, firearm of any kind, brass knuckles or any other offensive weapon so that his activities with the Millvale Police Force shall be entirely confined to desk duty and in the course of such duty he shall not be permitted to use any weapons of any kind upon prisoners or other persons.

(6) The court will retain jurisdiction of this case for the purpose of issuing further orders to insure that the requirements of this order are carried out.

2574a–76a.

8. *See Great Western Sugar Co. v. Nelson,* 442 U.S. 92, 99 S.Ct. 2149, 60 L.Ed.2d 735 (1979). *United States v. Munsingwear, Inc.,* 340 U.S. 36, 39, 71 S.Ct. 104, 106, 95 L.Ed. 36 (1950).

four named plaintiffs, and of support, encouragement or ratification by the remaining defendants in those specific instances. Even if we should reject defendants' challenge to the sufficiency of the evidence respecting the four named plaintiffs, defendants would have us direct the modification of the decree so that it protects only those plaintiffs, while Baranyai, the Mayor, the Chief of Police and the Council remain free of the threat of contempt in their dealings with other persons. They would, of course, be bound, by virtue of non-mutual collateral estoppel, by the determination that certain of their conduct is unconstitutional. Enforcement of the decree on a collateral estoppel basis would, however, require a plenary suit by a new plaintiff. Moreover, even if a more general injunction were authorized, the defendants could hope that policing its enforcement in the future would be less effective without the resources of the Commonwealth.

We are not impressed by the procedural subtleties to which we are asked to resort for the purpose of dismantling the injunction. The individual plaintiffs sought and the defendants successfully opposed class action certification. Before we could accept the position that absent the Commonwealth as a plaintiff, the decrees must be dismantled because of the absence of class certification, we would have to consider whether in what is plainly a Rule 23(b)(2) type action, any prejudice resulted to the defendants from the failure to make such a certification. None has been called to our attention. Moreover we would also have to consider whether, assuming the Commonwealth should have been dismissed, the court erred in yielding to the defendants' opposition to class certification. Certainly it comes with little grace for the defendants to urge as a ground for reversal the very absence of class action certification which they insisted upon in the trial court. We need not, however, explore these engaging possibilities. They arise only if we accept the defendants' basic premise that the Commonwealth is an improper plaintiff. We do not.

■ At the outset, a straw man at which there has been a good deal of tilting can be set to one side. That is the question whether the Commonwealth is a "person within the jurisdiction" of the United States within the meaning of 42 U.S.C. § 1983, or a "person" whose life, liberty or property is protected by Section 1 of the fourteenth amendment. The fourteenth amendment is a limitation upon the states in the interest of individuals, and section 1983 was enacted to facilitate vindication of such individual interests.[9] The question is not whether either the fourteenth amendment or section 1983 protects the Commonwealth—neither does [10]—but whether the Commonwealth is an appropriate plaintiff in an action seeking to prevent the infliction of constitutional violations on the persons the amendment and the statute do protect. If the Commonwealth is an appropriate plaintiff, there is subject matter jurisdiction in the district court, without regard to jurisdictional amount, under Federal Question Jurisdictional Amendments, Act of Dec. 1, 1980, Pub.L. 96–486, § 2(a)(b), 94 Stat. 2369, amending, 28 U.S.C. § 1331, since that statute applies to any civil action pending on December 1, 1980. See 28 U.S.C. § 1653. Thus we need not concern ourselves with the now obsolete question whether the Commonwealth could qualify as a plaintiff under 28 U.S.C. § 1343(3). The sole question is whether it is an appropriate plaintiff. The Commonwealth urges that it is suing as parens patriae both in its own behalf as a sovereign and as a representative plaintiff on behalf of persons in Millvale and elsewhere in Pennsylvania.

■ In considering the Commonwealth's sovereign interests, it is well to start with an occasionally neglected fundamental. The fourteenth amendment is the supreme

9. Perhaps a state, as a corporate entity owning property, is protected by Fifth Amendment against the federal government's deprivations of that property without due process.

10. See United States v. City of Philadelphia, 644 F.2d 187, 227 (3d Cir. 1981) (Gibbons, J., dissenting from denial of rehearing en banc).

law of the land in all of Pennsylvania. All executive officers of Pennsylvania, including the Attorney General, have taken the oath prescribed by Article IV, Section 6, Clause 3 to uphold that amendment. *See* 71 P.S. § 761; Pa.Const. Art. 6 § 3. By virtue of the supremacy clause, the Commonwealth has the same interest in compliance with the standard of conduct laid down in the fourteenth amendment as it has in compliance with standards of conduct enacted by the Pennsylvania legislature. The Commonwealth is vitally interested in the prevention of lawless exercises of the powers its laws confer upon police officers hired by its subdivisions. Moreover, the Commonwealth is, with respect to local government, a total sovereign which has delegated limited functions to entities such as the Borough of Millvale. *See, e. g., In re Gagliardi's Appeal*, 401 Pa. 141, 163 A.2d 418 (1960); *Golding v. Tp. of New Britain*, 33 Pa.Cmwlth. 635, 382 A.2d 509 (1978). Misconduct of local government officials both interferes with the proper discharge of those functions which the Commonwealth has delegated, and risks undermining public confidence in the instrumentalities to which it made the delegation. Additionally, patterns or practices of misconduct by local officials in violation of constitutional rights interferes with the performance of the obligation of executive officers of the Commonwealth to uphold and enforce those rights. If those executive officers cannot take steps to prevent the future occurrence of such violations by injunction, a burden of post-event enforcement by investigation and prosecution will be imposed upon the Commonwealth, which will divert its resources of staff and money from other tasks. The Commonwealth is also vitally interested in safeguarding the health and safety of individuals in its territory.[11] The Commonwealth's interest in prevention of physical abuse which may cause serious personal injury is no different in kind from the Commonwealth's interest in preventing poisoning by toxic waste or maiming by unsafe automobiles. In each instance the cost, ultimately, is borne by the Commonweal. Finally, failure to prevent future occurrences of violations of constitutional rights undermines the fiscal status of the Commonwealth's municipal creatures by exposing them to liabilities which can only be satisfied from tax revenues.[12]

In Pennsylvania, the Attorney General is the officer responsible for vindicating the sovereign interests referred to in the preceding paragraph. 71 P.S. §§ 244, 294(b), *repealed*, Commonwealth Attorneys Act of Oct. 15, 1980, No. 1980–164 (effective Jan. 20, 1981), *replaced with, id* §§ 201(a), 204(c). During oral argument before the full court the Deputy Attorney General representing the Commonwealth pointed to several reasons why, in vindicating them, it should not be forced to rely upon the happenstance of suits by individual victims of constitutional violations. First, many individual victims may be unable to show the likelihood of future violations of *their* rights, and will be relegated to damage actions only. Typical of such a potential victim is the one-time visitor to Millvale. Second, the burden of going forward with investigation and litigation of any action seeking injunctive relief against a pattern or practice of police misconduct is substantial, and is not likely to be within the resources available to the typical victims of such misconduct. Absent such resources an individual plaintiff may not be recognized by the court as an adequate class representative even if willing to

**11.** *Cf. Pennsylvania v. West Virginia*, 262 U.S. 553, 592, 43 S.Ct. 658, 663, 67 L.Ed. 1117 (1923) (original jurisdiction) (suit to enjoin West Virginia from cutting off supply of natural gas to Pennsylvania. Natural gas consumers "constitute a substantial portion of the State's population. Their health, comfort and welfare are seriously jeopardized by the threatened withdrawal of gas from the interstate stream. This is a matter of grave public concern in which the state, as the representative of the public, has an interest apart from that of the individuals affected. It is not merely a remote or ethical interest, but one which is immediate and recognized by law.").

**12.** *Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980); *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

sue. *See generally* Kaye & Sinex, *The Financial Aspect of Adequate Representation Under Rule 23(a)(4): A Prerequisite To Class Certification?*, 31 U. Miami L.Rev. 651 (1977). Thus, reliance ·on private enforcement is not likely to vindicate the Commonwealth's interests. Finally, in police misconduct cases the very real fear of intimidation and retribution is a significant deterrent to vigorous private enforcement actions.[13] Without the support of law enforcement at the state level, the Commonwealth could not anticipate that individual plaintiffs would have exposed themselves to that risk in order to vindicate the interests of the public.

■ Summarizing, then, the Commonwealth is in this suit advancing significant sovereign interests of its own in the prevention of future violations of constitutional rights of its citizens, in circumstances in which it cannot reasonably anticipate that private enforcement will achieve the protection of those sovereign interests. Any description of a parens patriae remedy, even the narrowest, includes the state of facts alleged in the Commonwealth's complaint.

Actions by a government for the prevention of harm to interests shared by all members of the community are no strangers to the federal law of remedies. The United States has been a frequent parens patriae plaintiff. *In re Debs*, 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092 (1895); *United States v. Lassiter*, 203 F.Supp. 20 (W.D.La.) (4 judge court), *aff'd per curiam*, 371 U.S. 10, 83 S.Ct. 21, 9 L.Ed.2d 47 (1962); *Fla-East Coast Ry. v. United States*, 348 F.2d 682 (5th Cir. 1965); *United States v. City of Jackson*, 318 F.2d 1 (5th Cir. 1963); *United States v. Original Knights of the KKK*, 250 F.Supp. 330 (E.D.La.1965) (3 judge court); *United States v. Brand Jewelers, Inc.*, 318

F.Supp. 1293 (S.D.N.Y.1970); *United States v. City of Shreveport*, 210 F.Supp. 36 (W.D. La.1962); *United States v. City of Montgomery*, 201 F.Supp. 590 (M.D.Ala.1962); *United States v. U.S. Klans*, 194 F.Supp. 897 (M.D.Ala.1961). In all these cases the United States sued in a parens patriae capacity to enjoin burdens upon interstate commerce.[14] Most involved burdens imposed by local law or custom, and which resulted in the violation of federal civil rights. Often such suits are authorized by federal statute such as 28 U.S.C. § 518(b). *See United States v. California*, 332 U.S. 19, 27, 67 S.Ct. 1658, 1662, 91 L.Ed. 1889 (1946). The presence or absence of an authorizing statute, however, bears not on the standing of the United States, an Article III issue, but on federal separation of powers concerns which are not implicated in this case. The federal sovereign interests supporting the settled standing of the United States to bring such actions are no different in kind from the sovereign interests which the Commonwealth seeks to vindicate.

■ Parens patriae actions by the states are also familiar federal court remedies of long standing. *See, e. g., Pennsylvania v. New Jersey*, 426 U.S. 660, 665, 96 S.Ct. 2333, 2335, 49 L.Ed.2d 124 (1976) (reviewing cases); *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 257–59 & n.12, 92 S.Ct. 885, 888–89 & n.12, 31 L.Ed.2d 184 (1972) (reviewing cases); *Georgia v. Pennsylvania R.R.*, 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945) (antitrust); *Missouri v. Illinois*, 180 U.S. 208, 21 S.Ct. 331, 45 L.Ed. 497 (1901) (interstate pollution). The federal courts must take care, of course, that state parens patriae suits are not resorted to as devices for the vindication of private rights that would not otherwise be within federal subject

---

**13.** There is substantial evidence in the record in this case suggesting that such a fear was not baseless. See district court fact findings 35 & 36, 480 F.Supp. at 691 (Baranyai filed criminal charges of barratry and harassment against Commonwealth's Deputy Attorney General two days after the latter filed this civil action; during trial in this case, Baranyai harassed and intimidated Commonwealth witnesses in courthouse hallway).

**14.** In *Brand Jewelers*, the Court also recognized the United States' authority to sue to enjoin widespread deprivations of due process in violation of the Fourteenth Amendment. *See also, United States v. City of Jackson, supra*, 318 F.2d at 14.

matter jurisdiction.[15] There are no such concerns here, however, because claims for injunctive relief for violations of constitutional rights are unquestionably within the district court's subject matter jurisdiction. Thus those cases stressing the importance of some form of strict scrutiny of the states' separate sovereign interest in order to avoid enlargement of our subject matter jurisdiction are not relevant. Even if they were, however, the sovereign interests we have identified above survive such scrutiny.

Courts in this circuit have long recognized that the Commonwealth may bring a parens patriae action in the United States District Courts to enforce the fourteenth amendment. *See, e. g., Commonwealth of Pa. v. Brown*, 260 F.Supp. 323, 338 (E.D.Pa. 1966), *vacated and remanded on other grounds*, 373 F.2d 771 (3d Cir. 1967) (en banc), *on remand*, 270 F.Supp. 782 (E.D.Pa. 1967), *affirmed*, 392 F.2d 120 (3d Cir.) (en banc), *cert. denied*, 391 U.S. 921, 88 S.Ct. 1811, 20 L.Ed.2d 657 (1968) (Commonwealth suit to desegregate Girard College); *Commonwealth v. Flaherty*, 404 F.Supp. 1022 (W.D.Pa.1975) (suit to redress employment discrimination by city and police officials); *Commonwealth v. Glickman*, 370 F.Supp. 724 (W.D.Pa.1974) (suit to redress employment discrimination by city officials). The defendants urge, however, that those cases are inconsistent with and were overruled by this court's decision in *Commonwealth of Pa. v. National Ass'n of Flood Ins.*, 520 F.2d 11 (3d Cir. 1975). Reliance on this case is misplaced for several reasons. In the first place the Commonwealth was in that case attempting as parens patriae to advance the interests of Pennsylvania flood victims against instrumentalities of the United States. It has been settled since *Massachusetts v. Mellon*, 262 U.S. 447, 486, 43 S.Ct. 597, 600, 67 L.Ed. 1078 (1923) that a state may not attempt as parens patriae to enforce rights of its citizens "in respect of their relations with the Federal Government. In that field it is the United States, and not the State, which represents them as parens patriae when such representation becomes appropriate; and to the former, and not to the latter, they must look for such protective measures as flow from that status." Thus the holding in *National Ass'n of Flood Ins.* is no more than an application of that settled rule. Moreover, apart from the nature of the defendants involved, that decision is simply an application of the rule to which we referred above—that parens patriae suits may not be used as a means to enlarge a federal court's subject matter jurisdiction over private claims which could not otherwise have been entertained. In that instance, failure to meet the administrative agency review requirement in 28 U.S.C. § 2675(a) precluded the claim. Thus the holding in *National Ass'n of Flood Ins.* in no way bears upon the standing of Pennsylvania to seek injunctive relief in a federal court against violations of the fourteenth

---

**15.** Thus states may not use the parens patriae device to permit private parties to resort to the Supreme Court's original jurisdiction, *Oklahoma ex rel. Johnson v. Cook*, 304 U.S. 387, 58 S.Ct. 954, 82 L.Ed. 1416 (1938) (state acting on behalf of private creditors); or to avoid the jurisdictional bar of the eleventh amendment. *New Hampshire v. Louisiana*, 108 U.S. 76, 2 S.Ct. 176, 27 L.Ed. 656 (1883) (citizen assigned board to state and state sued upon it). *See generally Hawaii v. Standard Oil Co., supra*, 405 at 258 n.12, 92 S.Ct. at 889 n.12. But the proposition sometimes derived from decisions barring a suit when the state acts as a collection agent, that assertion of a distinct proprietary interest is a prerequisite to a state parens patriae action, *cf. Commonwealth v. Ntl. Assn. of Flood Ins.*, 520 F.2d 11 (3d Cir. 1975), discussed *infra* at pp. 316–318 and note 16, is misconceived. The Supreme Court since the late nineteenth century has recognized that suits in vindication of federal property rights are but one aspect of the United States' parens patriae authority. The real bases for that authority are the government's obligations to secure proper law enforcement, and to protect the general welfare. *See, e. g., In re Debs, supra*, 158 at 584–86, 15 S.Ct. 900, 906–07, 39 L.Ed. 1092; *United States v. American Bell Telephone Co.*, 128 U.S. 315, 367–68, 9 S.Ct. 90, 97, 32 L.Ed. 450 (1888); *United States v. San Jacinto Tin Co.*, 125 U.S. 273, 284–86, 8 S.Ct. 850, 856–857, 31 L.Ed. 747 (1888). *But see, United States v. City of Philadelphia*, 644 F.2d 187 (3d Cir. 1980). Those obligations devolve upon state governments as well as upon the federal government, and hence afford states an equivalent authority to initiate suits in the public interest.

amendment. To the extent that any of the language in that case might be construed to support a different conclusion, it should be deemed overruled by this en banc decision.[16]

 We have held above that the traditional federal law remedy of a parens patriae action is generally available to the states for the enforcement of the fourteenth amendment in appropriate cases. Even were that remedy unavailable, however, there is another reason such a remedy must be recognized in Pennsylvania. At the time the Commonwealth brought this action, Pennsylvania's Administrative Code authorized the Department of Justice "to take such steps, and adopt such means, as may be reasonably necessary to enforce the laws of the Commonwealth." 71 P.S.

§ 294(b).[17] In *Commonwealth v. Gibney*, 21 D.&C.2d 5 (Chester Com. P. 1959) the Commonwealth brought an action to enjoin the proprietor of a public park from excluding Blacks. The defendants objected that only an individual plaintiff could bring such an action. The court held, however, that the Commonwealth had the same standing to seek injunctive relief as was recognized for the United States in *In re Debs*, 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092 (1895). 21 D.&C.2d at 9–10. Thus Pennsylvania law recognizes the availability of parens patriae relief even when individual relief might also be available.[18] That Pennsylvania law remedy is available in a federal district court proceeding in vindication of civil rights by virtue of Section 3 of the Civil Rights Act of 1866, 42 U.S.C. § 1988.[19]

16. In *Flood Ins.*, a panel of this Circuit asserted that the state must assert an interest "separate and apart from those injuries suffered by the state's citizens," and further suggested that availability of a private remedy to redress the conduct complained of would deprive the state of standing. 520 F.2d at 22. The second portion of that statement is inconsistent with prior Supreme Court decisions. *See, e. g., Pennsylvania v. West Virginia*, 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117 (1923) (suit to enjoin burden on interstate commerce) (state permitted to sue as representative of natural gas consuming public despite possible private action); *Georgia v. Tennessee Copper Co.*, 206 U.S. 230, 237, 27 S.Ct. 618, 619, 51 L.Ed. 1038 (1907) (interstate pollution) ("the state has an interest independent of and beyond the titles of its citizens, in all the earth and air within its domain") ("By these oft-quoted words, [Justice Holmes] shifted the emphasis from the inadequacy of private remedies to the inherent power of the state as sovereign and intimated that the state has interests beyond . . . the aggregate interests of its citizens." Note, *Federal Jurisdiction—Suits By a State as Parens Patriae*, 48 N.C.L.Rev. 963, 965 (1970). By the same token, the "inherent power of the state as sovereign" to enforce its sovereign interest in ensuring that its agents do not violate the law itself states a separate injury. By its very nature, a state, holding sovereign powers, is capable of being injured in ways that private litigants cannot be. See discussion *supra* pp. 313–314. Thus conventional indicia of injury in fact to private litigants, such as specific monetary losses, are not particularly relevant here.

17. It is not necessary here to consider whether the Commonwealth Attorney's Act of October 15, 1980, No. 1980–164, which provides for an elected Attorney General, and establishes a

General Counsel's office, was intended to restrict the Attorney General's power to take steps and adopt means reasonably necessary to enforce the laws of the Commonwealth.

18. *See also Commonwealth v. Williams*, 8 Bucks 206 (Com.Pl.1958) (Commonwealth brought 42 U.S.C. § 1982 injunctive action against KKK Members who had burned a Black family's home. 71 P.S. § 294(b) held to confer authority on Commonwealth Attorney General to initiate civil rights action).

19. The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of this chapter and Title 18, for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause, and, if it is of a criminal nature, in the infliction of punishment on the party found guilty. 42 U.S. § 1988. Cf. *Brazier v. Cherry*, 293 F.2d 401 (5th Cir. 1961) (adopting state survivorship statute) ("§ 1988 declares a simple, direct, abbreviated test: what is needed in the particular case under scrutiny to make the civil rights statutes fully effective? The answer to that

The Commonwealth also argues that even if its parens patriae standing as a plaintiff were not recognized, it should in any event be recognized as an adequate class representative of the class of persons in Millvale who in the past have been and in the future may be subjected to violations of constitutional rights by Millvale policemen. There is considerable merit to this contention, particularly in an action which appears to fall within Fed.R.Civ.P. 23(b)(2), for the interest in injunctive relief is common to the class. The trial court's failure to certify the action as a class action is not fatal to recognition of the Commonwealth's representative standing in such a case, since the same record has been made as would have been made had a Rule 23(b)(2) class been certified.[20] *See Pasadena City Bd. of Education v. Spangler*, 427 U.S. 424, 430–31, 96 S.Ct. 2697, 2702, 49 L.Ed.2d 599 (1976). (United States may continue action for injunctive relief even when no class has been certified and claims of individual plaintiffs are moot). It is not necessary to rest our recognition of the Commonwealth's standing as a plaintiff on this ground, however, since, as we have held above, both federal law and state law applicable by virtue of 42 U.S.C. § 1988, recognize the Commonwealth's parens patriae plaintiff status.

One final consideration, not advanced by the defendants in so many words, but suggested at least obliquely as a reason for dismissing the Commonwealth's complaint, is the availability of injunctive or other relief in the Commonwealth's own courts.

Somehow, the suggestion goes, it was unseemly for the Attorney General to resort to a federal forum in preference to a Pennsylvania state court. We do not know, and have no legitimate reasoning for inquiring why the Attorney General chose to bring an action for the vindication of federally protected rights in a federal forum. Congress has provided for federal question subject matter jurisdiction, and has not excluded the Commonwealth from resort to it. None of the familiar rhetoric of "equity, comity and federalism", which is advanced so often in support of federal door closing devices when the state is resisting relief in favor of private plaintiffs, has any application to cases in which the state, acting through one of its highest executive officers, seeks the aid of a federal court in assisting it in the discharge of its freely acknowledged duty to enforce the provisions of the federal constitution. Closing the doors of a federal court upon the Commonwealth as a plaintiff would be a perversion of principles of federalism.

Thus we find no merit in the defendants' contention that the Commonwealth's complaint should have been dismissed, and that therefore the injunction should be modified to eliminate all class-wide relief.

### IV

Each defendant also contends that in subjecting him to an injunction the court erred, either in making findings of fact which are clearly erroneous, in admitting or excluding

---

inquiry is then matched against (a) federal law and if it is found wanting the court must look to (b) state law currently in effect. To whatever extent (b) helps, it is automatically available, not because it is procedure rather than substance, but because Congress says so." 293 F.2d at 409.

 *Moor v. County of Alameda*, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973) does not mandate a different result here. In that pre-*Monell* decision, the Supreme Court held § 1988 does not incorporate a state law making state subdivisions liable for the civil rights violations of their agents. In *Moor*, § 1983 did not affect defendants' liability, and state law could not be imported to create a liability federal law at that time did not extend. In this case, there is no dispute that § 1983 creates liability for the

unconstitutional actions of municipal official and police defendants. The only question is whether § 1988 imports Pennsylvania's method of enforcing that liability. *Moor's* approving reference to *Brazier v. Cherry*, 411 U.S. at 702 n.14, 93 S.Ct. at 1792 n.14, suggests that it does.

**20.** Indeed, the trial court held the Commonwealth's plaintiff status substituted for class certification.

 While the court did not certify a class action, it was held that the case was one in effect in view of the fact that the Commonwealth was representing the rights of all of its citizens and we are treating this case in such light. 480 F.Supp. at 695.

evidence, or in fashioning injunctive relief. We consider the several defendants' contentions separately.

### A. Baranyai

■ The record includes extensive testimony about a series of incidents in which Baranyai subjected persons to unlawful arrest, unlawful search, unlawful brutalization and assault of persons in confinement, unlawful harassment of persons lawfully on the streets of Millvale, unlawful retaliation against persons who complained about his misconduct including unlawful arrest of such persons, and unlawful orders to persons to stay out of Millvale. With respect to all of these incidents, Baranyai either denied their occurrence or attempted legal justification. The plaintiffs' version of the events was supported not only by testimony of the alleged victims and independent witnesses, but in many cases by the testimony of other members of the Millvale police department. There were sharp issues of credibility. The court resolved those issues against Baranyai in more than 20 separate instances.[21] Its findings of fact concerning the historical events are not clearly erroneous. Moreover we cannot disagree with the court's conclusion, amply supported both by the magnitude of past violations over a relatively short period of time in a small town with a small police department, and by the attitude toward law enforcement set forth forcefully in Baranyai's own testimony, that there is a likelihood of repetition of violations in the future.[22]

■ Baranyai objects that since the complaint was filed on October 5, 1977 the court, in deciding whether to grant equitable relief, should have excluded all evidence of incidents occurring prior to October 5, 1975. There is no merit to this contention. There is evidence of a pattern or practice of violations of constitutional rights continuing up to and even after October 5, 1977. Evidence of the prior actions was admitted, as the trial court noted, under Fed.R.Evid. 404(b), "to show motives, intent, preparation, purpose, knowledge or absence of mistake or accident and to show plan or design. It is also admissible under Rule 406 to show a pattern or routine practice of a defendant or organization."[23] This ruling was correct. *Hazelwood School District v. United States*, 433 U.S. 299, 309–10 n.15, 97 S.Ct. 2736, 2742, n.15, 53 L.Ed.2d 768 (1977); *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 267, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977); *Williams v. Anderson*, 562 F.2d 1081, 1086 n.7 (8th Cir. 1977). The injunction was issued not because of the events in isolation occurring prior to October 5, 1975, but because, as evidenced in part by those events, a pattern or practice of violations occurred over a long period of time which extended well within the period of the statute of limitations, and was likely to continue in the future.[24]

■ Finally, Baranyai objects that the injunction which was issued is overbroad, both with respect to the class of persons protected and with respect to his own activities. The objection about the class protected is predicated upon the argument, which we have rejected in part III above, that the rights of those persons were not properly before the court. To the extent that the injunction restricts his own activities, he urges that "the evidence in the present case did not justify such extraordinary remedy." (Brief of Baranyai and Porter, 33.) Having examined that evidence, we cannot say that the court erred in concluding that it was necessary both to subject Baranyai to an injunction with respect to violations which

---

21. 480 F.Supp. 688–91.

22. 480 F.Supp. at 698.

23. 480 F.Supp. at 696.

24. Baranyai also contends that the court erred in excluding from evidence arrest records of certain witnesses who testified for the plaintiffs. His brief, however, refers us to nothing

suggesting that these rulings, not specifically identified, were an abuse of the court's discretion in passing upon relevance. Fed.R.Evid. 403. *See John McShain, Inc. v. Cessna Aircraft Co.*, 563 F.2d 632 (3d Cir. 1977) (trial court's refusal to admit 30 accident reports in suit alleging defective design not an abuse of discretion).

were with him habitual, and, by removing him from the streets of Millvale in a police capacity dealing with the public, to prevent the officials of that borough from encouraging his excesses. We note, moreover, that in paragraph 6 of the permanent injunction the trial court retained jurisdiction to issue further orders. If, because of his change in employment, Baranyai feels that the injunction should be modified in some specific respect he may make application for such modification in the district court. His brief here requests no specific modification, but only total relief from the injunction. That relief we do not grant.

### B. Police Chief Porter

■ The Chief of Police contends that no injunction should have been entered against him. He makes two points, one factual and one legal. The factual point is that there is no evidence warranting an injunction binding him, while his legal point is that the injunction interferes with the internal affairs of the police department in violation of the standards of *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). These arguments are necessarily interrelated, for as a statement of the appropriate scope of federal equitable relief, *Rizzo v. Goode* requires that we focus on the degree to which Chief Porter participated in a pattern of violation by virtue of knowledge, acquiescence, support and encouragement. *See Allee v. Medrano*, 416 U.S. 802, 812, 94 S.Ct. 2191, 2198, 40 L.Ed.2d 566 (1974). We quoted in Part I above, the court's finding of knowledge, acquiescence and support. The court also found that Porter was aware of allegations of police misconduct and abuse by Baranyai since at least April 13, 1974; that Porter never conducted a meaningful investigation or inquiry to determine if these allegations were true; and that Baranyai continued to engage in unconstitutional conduct, even during the trial, with Porter's knowledge and approval.[25] Porter was present at the Borough Council Meeting on September 9, 1975 when, during the regular part of the meet-

ing devoted to citizen complaints 8 persons complained about Baranyai's misconduct. (Plaintiff's Exhibit 3.) He was present on October 14, 1975 when six persons made such complaints (Plaintiff's Exhibit 4), on November 12, 1975 when another person made a complaint (Plaintiff's Exhibit 5), and on July 14, 1976 when five complaints were received (Plaintiff's Exhibit 6). On August 10, 1976 when two persons appeared to complain, Porter defended Baranyai. He observed "Officer Baranyai makes the most arrests; therefore Officer Baranyai is the one the people complain about." When the complaining citizen asked "are the Police Officers right all the time?" Porter responded, "they are right in what they say and do." (Plaintiff's Exhibit 7.) Six people appeared in Porter's presence to complain on September 14, 1976 about police practices. At the September meeting Councilman Beran criticized the police department's continued support of Baranyai. (Plaintiff's Exhibit 8.) At the next council meeting on October 12, 1976 Chief Porter made a speech, a copy of which is attached to Plaintiff's Exhibit 9, in which he vilified Councilman Beran, and certain citizens who made complaints. He defended the police practices with respect to enforcement of the loitering ordinance to prevent young people from congregating, and with respect to handling persons arrested "firmly," and suggested that such firm handling was necessary to compensate for the indulgence of "nice fathers." His statement illuminates his attitude toward the complaints against Baranyai:

> For those who choose to come to Council Meetings to complain about police officers or police action, I must tell them that if they feel they have a legitimate complaint, file charges against the officer. But, I think the time has come for the harassment of the police officer and police department to stop. The continued harassment of the officers and department has my men and I hesitant at doing our job, for fear of being attacked at the next council meeting.

25. 480 F.Supp. at 691.

There is, moreover, ample record evidence that Porter retaliated against Officers Cepek, Fisinger, Pfeiffer and Snyder who complained about or testified to Baranyai's misconduct. There is no question that Porter actively supported Baranyai in his extreme measures, actively resisted all efforts to have the Borough Council exercise its statutory authority to suspend or remove him, and took affirmative steps to prevent the Commonwealth from obtaining the testimony of witnesses against him. Unlike the city officials in *Rizzo v. Goode*, who were not shown to have direct knowledge of the activities complained of, and who were remote from the day to day operations of the police department, Porter had knowledge and was intimately involved. The evidence concerning an agreement among counsel in this case that pending the court's disposition, Baranyai would be assigned to a desk job, affords a noteworthy indication of Porter's attitude. Despite the agreement, Porter returned Baranyai to street duty, defending that decision before the Borough Council. (Plaintiff's Exhibit 16; meeting of Nov. 15, 1977.) His actions, his illuminating speech to the council and even his testimony all point to the likelihood of his continuing encouragement of the pattern of misconduct which was found, and thus to the need for subjecting him to an injunction. Indeed, at a Council Meeting on July 12, 1977 Baranyai, commenting on his indictment, stated that he thanked Chief Porter for showing him the ways of the road in enforcing the ordinance of the Borough. (Plaintiff's Exhibit 15.) Porter did not demur.

### C. Mayor McCarthy

█ In Part I we noted that the Mayor is by statute in full charge and control of the Borough's police force, with the mandatory duty to direct the manner in which policemen perform their duties, and with authority to suspend them temporarily until the Council can act. Plainly, the Mayor was obliged by law to investigate complaints of police misconduct and to take steps to prevent their recurrence. The court's finding that McCarthy received numerous complaints about Baranyai is amply supported both by the Council minutes disclosing his presence on most occasions when citizens complained, and by his own testimony respecting complaints made to him directly. The court found that he limited his investigation of those complaints to inquiries to Baranyai and his supporter Porter. The evidence supports this finding; indeed, there is no evidence that McCarthy initiated any more extensive inquiry. At council meetings he mollified complaining citizens by promising to investigate and report but did not do so. (Plaintiff's Exhibits 3, 4.) When Porter, while the suit was pending, returned Baranyai to street duty, McCarthy could have intervened, but did not. (1132a.) In the face of complaints to the Council, the Mayor announced "as a matter of fact, I'm certainly inclined to think Millvale needs more cops like Officer Baranyai. All of these complaints and charges against Officer Baranyai, to me, seem like nonsense and garbage!" (Plaintiff's Exhibit 12; 1116a.) Indeed he insisted, as a witness, that Baranyai had never been wrong. (1112a.) McCarthy publicly announced that he "strongly supports Officer Baranyai with respect to the performance of his job," (Plaintiff's Exhibit 4) and that he would never exercise his statutory power to suspend Baranyai. (Plaintiff's Exhibit 12; 1115a.) In vivid contrast, when other police officers testified unfavorably concerning Baranyai in the Commonwealth's criminal prosecution, or complained of his conduct, McCarthy exercised his statutory powers to retaliate against them. (1140a et seq.) The Mayor's testimony indicates his enthusiasm for use of Ordinance No. 305 to prevent young people from congregating on the streets of Millvale. (1149a et seq.) The court's conclusion that the Mayor is causally linked to the pervasive pattern of constitutional violations which it found, is amply supported by the record. Indeed, the evidence supports an inference of McCarthy's affirmative involvement in Baranyai's illicit practices. Baranyai's style of law enforcement apparently was just what the Borough's chief law enforcement official desired. An injunction against him is entirely warranted.

## D. The Borough Council

The Borough Council contends that *Rizzo v. Goode* requires the reversal of the injunction against it because the council has taken no active part in the Baranyai affair. That decision requires that officials against whom relief is ordered be causally linked to a pattern or practice of constitutional violations. In considering the Council's contention, we cannot ignore the obvious differences between the Borough of Millvale and the City of Philadelphia whose police department was involved in *Rizzo v. Goode*. In this case the record establishes that we are dealing with a very small police department which keeps only a few policemen on street patrol at any time. The Borough is small in area and population. The Borough Council has the statutory responsibilities with respect to the police department referred to in part I. Moreover it exercises them directly and regularly. Minutes of the Council Meetings in evidence disclose that the Chief of Police attends most council meetings, and as a regular practice reports to the Council on details such as the total number of calls to the police and the total number of arrests in each month. The Council devotes a regular part of every meeting to hearing citizen complaints. It received complaints about Baranyai at the meetings of August 13, 1974; December 10, 1974; September 9, 1975; October 14, 1975; November 12, 1975; July 14, 1976; August 10, 1976; September 14, 1976; October 12, 1976; August 9, 1977; September 13, 1977; February 14, 1978. Many of those complaints concerned incidents which the district court found to be violations of constitutional rights. Although Councilmen Beran and Lawson sought to have the Council exercise its statutory power to suspend or terminate Baranyai, they were voted down. When Mayor McCarthy urged the Council to terminate Officer Cepek, a move which the trial court found to be retaliatory against Cepek's testimony against Baranyai, the Council voted to terminate. Only Beran and Lawson voted in Cepek's favor.

When it was called to the Council's attention that, despite an agreement among counsel for the Commonwealth and counsel for the defendants that Baranyai would be kept off the streets pending the outcome of the trial, Baranyai was nevertheless assigned to street duty, the Council by inaction tacitly approved Porter's decision. (Plaintiff's Exhibit 16.) When Baranyai became aware that he faced criminal charges and asked for financial support for legal services for his defense, the minutes disclose,

> Chairman Seidel then asked the Borough Solicitor what should be done? Borough Solicitor, Alfred Maiello, stated that he would talk to the Chief of Police and Officer Baranyai to find out all of the details and report back to council. Chairman Seidel suggested that [the] council as a whole give Officer Baranyai their support. Provided that it is agreeable with the Borough Solicitor upon his review of the facts of the charges. All Councilman [sic] gave their support for Officer Baranyai except Councilman Beran who did not comment. Chairman Seidel then stated how far does the Borough go in support financially? This question cannot be answered until the Solicitor gives a complete report as to his findings.

(Plaintiff's Exhibit 15.) This warm support for Baranyai following his indictment contrasts sharply with the attitude displayed toward Officer Cepek a few months later at the February 14, 1978 meeting. At the latter meeting Baranyai's attorney "extended his heartfelt thanks for the support given by the Council and the Mayor concerning Officer Baranyai." By then, Baranyai had been convicted of one count of simple assault, and two counts of official oppression.[26] The minutes disclose:

> Mayor McCarthy, addressing the members of the Council, asked the following question: I want an answer from the Council in regards (sic) to Officer Baranyai? How does the Council feel on this

---

**26.** He was acquitted on 22 of 25 counts. We are advised that on appeal his conviction was reversed and remanded for a new trial.

matter? Councilman Jerry Dawson then made a motion to continue to support Officer Frank Baranyai. It was seconded by Councilman Bedel. Chairman Seidel then asked for a question on the motion. The only question on the motion was given by Councilman Beran who opposed the motion. Councilman Beran stated that due to the recent developments in court where Officer Baranyai has been found guilty of three charges warrants me to say that I believe in the judicial process of the law and that I am in favor of a suspension of Officer Baranyai until the appeals are over. I would like to request a roll call on this matter, stated Councilman Beran. No roll call vote was taken. (Plaintiff's Exhibit 12.)

Council President Seidel, the only council member who testified, acknowledged that the council received more complaints about Baranyai than about any other officer. (1223a.) Normally the council did not investigate, but merely referred the complaint to the Chief of Police or the Mayor. (1224a.) The Council police committee never investigated a complaint. (1226a.)

The picture that emerges from the minutes and Seidel's testimony is that of a council which recognized that it had the power to investigate complaints, and recognized that only it had the power to terminate a policeman or suspend him for any extended period, but which, despite repeated complaints about Baranyai's course of conduct, was well satisfied to leave matters in the hands of Chief Porter and Mayor McCarthy, who were his active supporters. The court, looking at their longstanding knowledge, their inaction, their affirmative support, their unwillingness to suspend even following a conviction, their sharply contrasting treatment of Officer Cepek, certainly was not clearly erroneous in concluding that a majority of the council members participated in a pervasive pattern of support for his misconduct. Unlike the City defendants in *Rizzo v. Goode*, the Council is "directly responsible" for the police department's operations. *Rizzo v. Goode* does not require the adoption of an ordinance saying in so many words "we direct that the constitution be violated" before an inference can be drawn of the existence of an official policy of encouragement of such violations.[27] Inaction by those with a statutory duty to take action can convey a potent message.[28] Moreover, the Council has coupled its failure to discipline Baranyai with retaliation against another police officer who had testified against Baranyai. The court did not err in concluding that the council's inaction and support were causally related to Baranyai's continuing pattern of misconduct.[29]

---

**27.** The atmosphere prevailing in the Borough Council, however, suggests that such an ordinance would not have been completely far-fetched in Millvale. For the July 12, 1977 meeting, at which the Council voted to support Baranyai, the minutes disclose the following statement by one council member:

Under the hearing of citizens concerning Officer Baranyai and the charges brought against him, Councilman Lawson stated that there have been differences of opinion between Officer Baranyai and myself in the past. However, I love him and give him my support 100%. It's about time that we get rid of the scum-bags in this Borough.

(Plaintiff's Exhibit 15.)

**28.** A majority of the Supreme Court in *Rizzo v. Goode* rejected the contentions that Philadelphia's City officials maintained a constitutional duty to prevent civil rights violations by members of the police department "even without a showing of direct responsibility" for the actions of individual police, and that mere inaction constituted a breach of that duty. 423 U.S. at 375–76, 96 S.Ct. at 606–07. But an analogy between the *Rizzo* defendants and the Borough Council here is not even superficially persuasive. The Borough Council has not a remote and vague duty to prevent civil rights violations, but a direct and affirmative statutory obligation to oversee the operations of the Millvale police force, and to survey the conduct of each member of that force. The nature of the Borough's organization under the Code and the Council's close proximity to the daily operations of the Millvale police force supply the causal connection the Supreme Court found lacking in *Rizzo*.

Failure to discharge an affirmative duty has long been recognized as a basis for liability. *See, e. g.,* McNiece and Thornton, *Affirmative Duties in Tort*, 58 Yale L.J. 1272 (1949).

**29.** The defendants note that the membership of the Council has changed from time to time. The injunction, however, is directed only at

Moreover, the injunction against the council is justified as an appropriate means of making fully effective the injunction against the Chief of Police, the Mayor and Baranyai. 28 U.S.C. § 1651(a) (the All Writs Act).[30] In *United States v. New York Telephone Co.*, 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977), the Supreme Court held the All Writs Act authorizes a federal court to compel a nonculpable third party's compliance with a court order.

> The power conferred by the Act extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, and encompasses even those who have not taken any affirmative action to hinder justice.

434 U.S. at 174, 98 S.Ct. at 373 (citations omitted). This Circuit recently stated that "the basis of [injunctive] relief [under the All Writs Act] against a third party is not culpability, but practical necessity." *Pittsburgh-Des Moines Steel Co. v. United Steelworkers*, 633 F.2d 302, 307 (1980). Here, the Borough Council is "in a position to frustrate implementation" of the court's injunction, for under the Borough Code, ultimate responsibility for hiring, firing, and demoting police officers rests with the Council. *See* Part I, *supra*. The Borough Council's cooperation may well be required if Baranyai is to be confined to the position of a desk officer. Thus, although the Council should be held culpable under the standard of *Rizzo v. Goode*, section 1651 affords a separate reason for making the Council subject to the injunction against Porter, McCarthy and Baranyai.

### V

The defendants also contend that the injunction is much broader than is warranted by the violations which were found.[31] The main focus of their objections is on paragraph (5), which enjoins Baranyai's employment as a policeman in Millvale in any but a desk capacity, and enjoins him from using weapons even in that capacity. Considering the pattern or practice of violation of constitutional rights which the court found, this relief was not an abuse of discretion. If the Council was so interested in Baranyai's continued services that it would accept them on so limited a basis, it was left free to do so. But an order protecting persons in Millvale from Baranyai's unconstitutionally excessive zeal was necessary, and that which was entered is reasonable. In any event, because of Baranyai's new employment, many of the provisions of the injunction impose no serious burdens on the remaining defendants unless Baranyai returns to Millvale and is rehired. The injunction was for the most part tailored to Baranyai's expected presence. Finally, since the district court has retained jurisdiction, all defendants are free to apply for a modification of the injunction because of changed circumstances. That is a matter on which it may be necessary to make a further record. On the record before us, the injunction is tailored to the pattern or practice of violations which was found, and should be affirmed in all respects.

GARTH, Circuit Judge, concurring in part and dissenting in part, with whom ALDISERT and HUNTER, Circuit Judges, join:

The district court, in this case, made extensive factual findings which revealed that Frank Baranyai, a police officer, had disregarded and violated the constitutional rights of a number of individuals over a prolonged period of time in the course of some 22 separate incidents. Baranyai was

---

activity in an official capacity. A change in membership of the Council is not a reason for denying injunctive relief, but rather for substituting parties. Fed.R.Civ.P. 23(d); Fed.R. App.R. 43(c).

**30.** 28 U.S.C. § 1651(a) provides:

The Supreme Court and all courts established by Act of Congress may issue all writs

necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

**31.** They do not urge that the injunction is insufficiently specific to satisfy the requirements of Fed.R.Civ.P. 65(d).

employed by the Borough of Millvale, a borough of some 5,000 inhabitants located in Allegheny County, Pennsylvania. Additionally, the district court found that the Mayor and Police Chief, as well as the members of the Borough Council, were also liable in connection with Baranyai's actions. I write separately because in significant respects my view of this appeal differs markedly from that of my colleagues.

First, and most important, I do not believe that the Commonwealth had standing as a plaintiff to bring this action on its own behalf or on behalf of its citizens. Second, I do not find sufficient evidence in this record to hold the Borough Council members liable and thus to subject them to an injunction.[1] *See Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), and *Lewis v. Hyland*, 554 F.2d 93 (3d Cir.), *cert. denied*, 434 U.S. 931, 98 S.Ct. 419, 54 L.Ed.2d 291 (1977). Third, the district court had drawn its injunction on the basis of the Commonwealth as a party and the Borough Council members as culpable defendants, and did not decide the issue of class certification, as I believe it should have. Therefore, rather than attempt to draft and impose an injunction at the appellate level which could accommodate all of the changed circumstances which our rulings would require, I would remand to the district court for a determination of whether a class action should be certified and, in any event, for a restructuring of its injunction to accommodate the concerns expressed by and the rulings of this court.

## I.

A brief summary of the proceedings in this case may be helpful in understanding the issue of the Commonwealth's standing that has divided the court.

The panel before which this case was originally argued focused on the Commonwealth's standing. It was concerned with whether the.Commonwealth could sue as a plaintiff under § 1983, either because it had suffered injury to its sovereign interest or had demonstrated a quasi-sovereign interest giving it standing in a *parens patriae* capacity.

As any other plaintiff must do, in order to qualify as a § 1983 plaintiff, the Commonwealth must satisfy the statutory requirement of being a "citizen of the United States or *other person* . . . injured. . . ."[2] No claim has ever been made, nor could it be, that the Commonwealth is a "citizen of the United States." Therefore to sustain its plaintiff status, the Commonwealth must come within the rubric of an "other person" who has been injured.

The district court had not found it necessary to resolve the question of the Commonwealth's standing to sue for injury to its sovereign interest since it had held in a memorandum opinion of February 24, 1978 "that there was no showing that the Commonwealth of Pennsylvania had been injured personally by the series of events alleged in the complaint . . . ." *Common-*

---

1. I am satisfied that the findings of the district court with respect to Baranyai, Mayor McCarthy and Police Chief Porter were not clearly erroneous, *see Krasnov v. Dinan*, 465 F.2d 1298 (3d Cir. 1972), and should therefore be upheld. I am also satisfied that despite Baranyai's resignation the case is not moot.

 I believe this case cannot be considered moot both because of the inclusion of offending officials who remain in their positions, as defendants, as well as the fact that this case is before us as an appeal from the granting of injunctive relief under 28 U.S.C. § 1292(a)(1). As such, disposition has not finally been had of all matters, including the award of attorney's fees. In this case, that award could depend on this court's resolution of the underlying question of whether the Commonwealth was a proper

plaintiff in this action. *Cf. Bagby v. Beal*, 606 F.2d 411, 414 (3d Cir. 1976) (attorneys' fees may be awarded to prevailing party without a merits review, even when case is moot on appeal).

2. 42 U.S.C. § 1983 provides:

 [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States *or other person* within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

 (Emphasis supplied.)

*wealth of Pennsylvania v. Porter*, 480 F.Supp. 686, 694–95 (W.D.Pa.1979). I understand the "personal" status, to which the district court referred, to be synonymous with injury to the Commonwealth's sovereign interest. Thus, the district court disposed of the Commonwealth's "personal" standing on an alternate ground: a failure to demonstrate injury. The district court's holding in this respect, however, was not critical to the continuation of the litigation because that court then allowed the action to proceed with the Commonwealth as a plaintiff under a *parens patriae* theory.

On appeal heard by a panel of this court, the Commonwealth continued to claim that as an "other person" within § 1983, it had standing either "personally" or as *parens patriae* to maintain this action as a plaintiff. The panel held, contrary to the district court, that the Commonwealth had no standing as a plaintiff under § 1983 on any basis, and in particular, held that on this record, the state could not sue as a plaintiff "other person" under that statute. As a consequence, rehearing was ordered by the court *en banc*, and the panel opinion was vacated.

Prior to the argument before the *en banc* court, the Commonwealth continued to assert both personal and *parens patriae* standing until, on the eve of rehearing, it moved to "withdraw[ ] its argument that it, the Commonwealth, is a person within the meaning of 42 U.S.C. § 1983." While maintaining that the Commonwealth did not lack standing under the *parens patriae* doctrine, the Commonwealth nevertheless conceded "that the panel of this Court was correct in holding that the Commonwealth is not a person within the terms of § 1983 . . . ."

In so conceding, the Commonwealth apparently recognized that a state itself cannot seek the protection of § 1983 with respect to its own sovereign interests.[3]

Having put to rest one aspect of the standing claimed by the Commonwealth, I turn next to the alternate ground of *parens patriae* standing also asserted by the Commonwealth. I conclude that in this respect as well, *parens patriae* standing is not available to the Commonwealth in this case because the Commonwealth failed to allege and prove injury to a "quasi-sovereign" in-

**3.** No court of appeals has had the occasion to address this question but an examination of § 1983 itself and a review of the legislative history that was examined in *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), leads to the conclusion that states were never deemed to fall within the class of those for whom Congress created a remedy when it enacted § 1983.

First, § 1983 itself speaks of liability for "the deprivation of any rights, privileges, or immunities" brought about "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory." By its terms, the statute offers redress to those who are injured under the color of state authority. Allowing a state to bring suit, against its own instrumentalities and against its own officers, for their alleged violations, under color of state law, of federal rights belonging to the very state which is suing, turns the statute on its head. "Representative Bingham, the author of § 1 of the Fourteenth Amendment, for example, declared the bill's [the predecessor of § 1983] purpose to be 'the enforcement . . . of the Constitution on behalf of every *individual* citizen of the Republic . . . '" (emphasis supplied, ellipsis in original, citation to Congressional Globe omitted).

*Monell* at 685 n.45, 98 S.Ct. at 2033 n.45. And the *Monell* Court in describing the function of § 1983 quoted Representative Shellabarger describing the Act as providing "a civil remedy for . . . all *people* where, under color of State law, they or any of them may be deprived of rights to which they are entitled under the Constitution by reason and virtue of their national citizenship" (emphasis supplied, citation to Congressional Globe omitted). *Id.* at 683, 98 S.Ct. at 2032.

The Commonwealth assuredly has the power to regulate conduct by its municipalities when that conduct infringes upon the constitutional rights of the Commonwealth's citizens. In addition, Congress has granted all citizens of this country a right to proceed against state and local officials, agencies, and municipalities for infringement of federally created rights. That is the obvious intendment and purport of § 1983. But Congress has not gone so far as to provide in § 1983 a similar statutory remedy of which the state can avail itself.

Judge Gibbons in his separate opinion apparently agrees that § 1983 was enacted to facilitate vindication of individual interests, and that neither § 1983 nor the fourteenth amendment *protects the Commonwealth*. (*Op. of Gibbons, J.*, p. 314 *ante.*)

terest affecting all its citizenry. Instead, the Commonwealth has sought to litigate, as a volunteer, personal claims of its individual citizens. *See Pennsylvania v. New Jersey*, 426 U.S. 660, 665, 96 S.Ct. 2333, 2335, 49 L.Ed.2d 124 (1976).

## II.

*Parens patriae* standing has traditionally and uniformly been available to the sovereign when the relief sought could not be obtained by individuals:

> The concept of *parens patriae* is derived from the English constitutional system. As the doctrine developed from its feudal beginnings, the King retained certain duties and powers, which were referred to as the "royal prerogative." These powers and duties were said to be exercised by the King in his capacity as "father of the country." Traditionally, the term was used to refer to the King's power as guardian of persons under legal disabilities to act for themselves. For example, Blackstone refers to the sovereign or his representative as "the general guardian of all infants, idiots, and lunatics," and as the superintendent of "all charitable uses in the kingdom." In the United States, the "royal prerogative" and the "parens patriae" function of the King passed to the States.
>
> The nature of the *parens patriae* suit has been greatly expanded in the United States beyond that which existed in England. This expansion was first evidenced in *Louisiana v. Texas*, 176 U.S. 1, 20 S.Ct. 251, 44 L.Ed. 347 (1900), a case in which the State of Louisiana brought suit to enjoin officials of the State of Texas from so administering the Texas quarantine regulations as to prevent Louisiana merchants from sending goods into Texas. This Court recognized that Louisiana was attempting to sue, not because of any particular injury to a business of the State, but as *parens patriae* for all her citizens. 176 U.S., at 19, 20 S.Ct., at 257. While the Court found that *parens patriae* could not properly be invoked in that case, the propriety and utility of *parens patriae* suits were clearly recognized.

> This Court's acceptance of the notion of *parens patriae* suits in *Louisiana v. Texas* was followed in a series of cases: *Missouri v. Illinois*, 180 U.S. 208, 21 S.Ct. 331, 45 L.Ed. 497 (1901) (holding that Missouri was permitted to sue Illinois and a Chicago sanitation district on behalf of Missouri citizens to enjoin the discharge of sewage into the Mississippi River); *Kansas v. Colorado*, 206 U.S. 46, 27 S.Ct. 655, 51 L.Ed. 956 (1907) (holding that Kansas was permitted to sue as *parens patriae* to enjoin the diversion of water from an interstate stream); *Georgia v. Tennessee Copper Co.*, 206 U.S. 230, 27 S.Ct. 618, 51 L.Ed. 1038 (1907) (holding that Georgia was entitled to sue to enjoin fumes from a copper plant across the state border from injuring land in five Georgia counties); *New York v. New Jersey*, 256 U.S. 296, 41 S.Ct. 492, 65 L.Ed. 937 (1921) (holding that New York could sue to enjoin the discharge of sewage into the New York harbor); *Pennsylvania v. West Virginia*, 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117 (1923) (holding that Pennsylvania might sue to enjoin restraints on the commercial flow of natural gas); and *North Dakota v. Minnesota*, 263 U.S. 365, 44 S.Ct. 138, 68 L.Ed. 342 (1923) (holding that Minnesota could sue to enjoin changes in drainage which increase the flow of water in an interstate stream).
>
> These cases establish the right of a State to sue as *parens patriae* to prevent or repair harm to its "quasi-sovereign" interests.

*Hawaii v. Standard Oil Co.*, 405 U.S. 251, 257–58, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972) (footnotes and citations omitted).

The one constant throughout this doctrinal development has been that even as the concept of *parens patriae* has expanded, the sovereign was entitled to proceed under the doctrine *only* when no individual or group of individuals could seek the same relief.

The Court has recognized the legitimacy of *parens patriae* suits. See *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 257–260, 92 S.Ct. 885, 888–890, 31 L.Ed.2d 184

(1972); *Louisiana v. Texas*, 176 U.S. 1, 19, 20 S.Ct. 251, 257, 44 L.Ed. 347 (1900). It has, however, become settled doctrine that a State has standing to sue only when its sovereign or quasi-sovereign interests are implicated and it is not merely litigating as a volunteer the personal claims of its citizens. *Pennsylvania v. New Jersey*, 426 U.S. 660, 665, 96 S.Ct. 2333, 2335, 49 L.Ed.2d 124 (1975). Thus, in a case such as this one, the state, in order to assert *parens patriae* standing, must allege and must establish a widespread injury or threat which affects, or could potentially affect, the well being of virtually all of its citizens.[4] *Commonwealth of Pennsylvania v. National Association of Flood Insurers*, 520 F.2d 11, 22 (3d Cir. 1975) (citations omitted) (quasi-sovereign interest "generally arises from either (1) the State itself having suffered injury, such as direct damage to its economy, or (2) the general public having suffered an injury so that no one individual has legal standing to sue"); *Commonwealth of Puerto Rico v. Alfred L. Snapp & Sons*, 632 F.2d 365, 369 (4th Cir. 1980) ("The decisions have generally agreed that a substantial portion of the population must be affected in order that the sovereign may represent them in a parens patriae capacity."); *Commonwealth of Pennsylvania v. Kleppe*, 533 F.2d 668, 675 (D.C.Cir.), *cert. denied*, 429 U.S. 977, 97 S.Ct. 485, 50 L.Ed.2d 584 (1976) ("It thus appears that injury to the state's economy or the

health and welfare of its citizens, if sufficiently severe and generalized, can give rise to a quasi-sovereign interest in relief as will justify a representative action by the state."); *State of Missouri v. National Organization for Women, Inc.*, 467 F.Supp. 289, 299 (W.D.Mo.1979) (Missouri claims *parens patriae* standing because the "broadened base of incidence of injury (every economic sector affected) coupled with a consideration of the magnitude of its economic *effect* (post-multiplier) is sufficient to constitute an injury to the 'general economy' of the state."); *aff'd*, 620 F.2d 1301 (8th Cir.), *cert. denied*, —— U.S. ——, 101 S.Ct. 122, 66 L.Ed.2d 49 (1980). *Land O'Lakes Creameries, Inc. v. Louisiana State Board of Health*, 160 F.Supp. 387, 389 (E.D. La.1958) (3 judge court) (No *parens patriae* standing when "the interests of the single industry here involved must be held to be private interests, not interests affecting the whole economy or all the people of the state.").

I have found no decision of the Supreme Court, in which *parens patriae* standing has been permitted, which has not involved a burden upon the entire community. Nor has any case been called to my attention which holds that state *parens patriae* suits may be maintained to vindicate individual or personal rights such as those at issue here, even when constitutional violations are alleged.[5]

---

4. The "across the board" character of *parens patriae* was recognized as early as 1900. In concurring with the Court's dismissal of Louisiana's complaint, in which an embargo by Texas officials was claimed to have caused harm to the city of New Orleans, Mr. Justice Brown concluded "... the objection to the present bill is that it does not allege the stoppage of all commerce between the two States, but between the city of New Orleans and the State of Texas. The controversy is not one in which the citizens of Louisiana generally can be assumed to be interested, but only the citizens of New Orleans, and it therefore seems to me that the State is not the property party complainant." *Louisiana v. Texas*, 176 U.S. 1, 28, 20 S.Ct. 251, 260, 44 L.Ed. 347 (1900) (Brown, J., concurring).

5. The very cases cited throughout Judge Gibbons' opinion, which address *parens patriae* standing and which he claims support his con-

clusion that *parens patriae* standing is available *in this case*, recognize and satisfy the two requirements specified in case law and to which I refer: (1) that the burden must be community-wide and (2) that *parens patriae* is not available in suits seeking redress for individual injuries.

Relying on those same cases, I have concluded that *in this case*, neither requirement has been satisfied, and thus *parens patriae* standing must be denied.

Moreover, contrary to Judge Gibbons' reading of *Commonwealth of Pennsylvania v. National Association of Flood Insurers*, 520 F.2d 11 (3d Cir. 1975), op. of Gibbons, J., at p. 318 n.16, *ante, Flood Insurers* is consistent with all Supreme Court authority to date. The fact that an individual action may be brought for an individual's own damages does not detract from the state's right to bring an action for injury to its quasi-sovereign interest. Thus a state may be injured by air pollution which

These, then, are the two unalterable requirements for *parens patriae* standing: "across-the-board burdens" which, in its very statement, excludes the prosecution of individual rights by the State and the affirmative requirement that the State may not, under the guise of *parens patriae*, litigate as a volunteer the personal claims of its citizens. Conversely, it is apparent that in cases where the proofs demonstrate that either the federal government, or a state government, is seeking to prevent harm to interests shared by *all* members of their respective communities, *parens patriae* may be appropriate.[6]

In Judge Gibbons' separate opinion, he recites that "[t]he United States has been a frequent parens patriae plaintiff" where it has sought to prevent "harm to interests shared by all members of the community." Op. of Gibbons, J., at p. 316 *ante*. I agree that when *all* members of a community, state or federal, are subject to injury it may be an appropriate case for either the state or the federal government to assert its status as a *parens patriae* plaintiff. I hasten to note, however, that *in this case*, the harm alleged and the harm proved was limited to an exceedingly small number of the Millvale community—no more than fifty individuals—a far cry from *all* members of the [Commonwealth] community.[7] Even Judge Gibbons acknowledges that "[i]n this case

affects all of its citizens and which may give rise to an injunctive or damage action by the state in its *parens patriae* capacity. Such an action would not preclude an individual from bringing an action in which he asserts his own personal damages and for which he seeks redress.

6. Unlike individual plaintiffs, States, when they are proper plaintiffs, may bring their actions directly in the Supreme Court. U.S.Const. Art. III, § 2, cl. 2.

Therefore, the strictures placed on *parens patriae* standing when a state is a plaintiff are a reflection of the Supreme Court's concern that a state not abuse this constitutional prerogative. Accordingly, a state is denied *parens patriae* standing when it takes the place of an individual litigant and seeks to obtain in court that which an individual litigant could obtain by an individual cause of action. *Pennsylvania v. New Jersey*, 426 U.S. 660, 96 S.Ct. 2333, 49 L.Ed.2d 124 (1976); *Oklahoma ex rel. Johnson v. Cook*, 304 U.S. 387, 58 S.Ct. 954, 82 L.Ed. 1416 (1938); *Oklahoma v. Atchison, T., & S.F.R. Co.*, 220 U.S. 277, 31 S.Ct. 434, 55 L.Ed. 465 (1911).

7. Interestingly, the cases which are cited in Judge Gibbons' opinion, p. 316 *ante*, are not authority for his *parens patriae* proposition, although I do not dispute that where *all* members of the community are involved, *parens patriae* standing may be appropriate. None of the cases cited at page 316 in Judge Gibbons' opinion even uses the term *parens patriae*. All of the cases cited involve interstate commerce. In some, the United States sued under the *Debs* doctrine to remove a burden on interstate commerce deriving its standing from the Commerce Clause of the Constitution. *In re Debs*, 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092 (1895); *Florida-East Coast Ry. v. United States*, 348 F.2d 682 (5th Cir. 1965); *United States v. City of Jackson*, 318 F.2d 1 (5th Cir. 1963); *United States v. Brand Jewelers, Inc.*, 318 F.Supp.

1293 (S.D.N.Y.1970); *United States v. City of Shreveport*, 210 F.Supp. 36 (W.D.La.1962); *United States v. U.S. Klans*, 194 F.Supp. 897 (M.D.Ala.1961). In the remainder, the United States sued by virtue of an authorizing statute. *United States v. Lassiter*, 203 F.Supp. 20 (W.D. La.) (3 judge court), *aff'd per curiam*, 371 U.S. 10, 83 S.Ct. 21, 9 L.Ed.2d 47 (1962); *United States v. Original Knights of the KKK*, 250 F.Supp. 330 (E.D.La.1965) (3 judge court); *United States v. City of Montgomery*, 201 F.Supp. 590 (M.D.Ala.1962).

To the extent that *Brand Jewelers* is relied upon for the proposition that due process clause violations support the standing of the United States in such circumstances, *see* op. of Gibbons, J., at p. 316 n.14 *ante*, it must be recognized that this court has specifically rejected any notion that the Attorney General may sue to enjoin widespread due process violations in the absence of an authorizing statute. *United States v. City of Philadelphia*, 644 F.2d 187, 202 n.23 (3d Cir. 1980). Moreover, the citation in n.14 to *United States v. City of Jackson*, 318 F.2d 1 (5th Cir. 1963), is of little relevance in the present context. *Jackson*, in dictum, was addressing the standing of the United States to challenge the action of *a state*, when the state, by a law or pattern of conduct, takes action which collides with national policy as expressed in the Constitution. In the present case, the United States is not challenging a state's action. That issue was discussed and disposed of by this court, but in a "city" context, when the United States sought an injunction against the City of Philadelphia. *United States v. City of Philadelphia, supra*. In this case, it is a state—the Commonwealth of Pennsylvania—which seeks redress for actions against individuals, when such actions have neither been alleged nor proved to have statewide impact.

the record establishes that we are dealing with a very small police department which keeps only a few policemen on street patrol at any time. The Borough is small in area and population." Op. of Gibbons, J., at p. 323 *ante.*

Indeed, the record discloses that in this case, the impact of Baranyai's actions has been limited to no more than approximately one percent (1%) of Millvale's population and .00004% of the Commonwealth's entire population.[8] Here, one police officer was responsible for some 22 incidents in a small Borough—population 5,000—in Pennsylvania. The individual plaintiffs, who are the only ones with standing under § 1983 to redress the injuries which they suffered, sought and obtained appropriate relief. Without question, if the Commonwealth has no standing, as I claim it does not, the district court would certify this action as a class action because the district court's denial of class certification was predicated solely upon the assumption that the Commonwealth had standing. Interestingly, the Commonwealth itself maintained that so long as there are individual plaintiffs, the standing of the Commonwealth was inconsequential. The Commonwealth's brief asserted:

> Certainly, there is no question about the standing of the individual plaintiffs to assert their rights and to maintain this law suit. Because of their presence, the Court need not consider whether the Commonwealth has standing to maintain this action. *Arlington Heights v. Metropolitan Housing Corporation,* 429 U.S. 252, 264 n.9, 97 S.Ct. 555, 562 n.9, 50 L.Ed.2d 450 (1977).

Pa.Br. at 32.

### III.

Having concluded that for *parens patriae* standing, two requirements are necessary, I turn to the question of whether those requirements are different, or less, in a fourteenth amendment setting. I conclude they are not.

### A.

It has been asserted that "[c]ourts in this circuit have long recognized that the Commonwealth may bring a parens patriae action in the United States District Courts to enforce the fourteenth amendment." Op. of Gibbons, J., at p. 317 *ante.* In support of that "long recognized" practice, three district court cases are cited: *Commonwealth of Pennsylvania v. Brown,* 260 F.Supp. 323 (E.D.Pa.1966), *vacated and remanded on other grounds,* 373 F.2d 771 (3d Cir. 1967) *(en banc), on remand,* 270 F.Supp. 782 (E.D.Pa.1967), *aff'd,* 392 F.2d 120 (3d Cir.) *(en banc), cert. denied,* 391 U.S. 921, 88 S.Ct. 1811, 20 L.Ed.2d 657 (1968); *Commonwealth of Pennsylvania v. Flaherty,* 404 F.Supp. 1022 (W.D.Pa.1975); *Commonwealth of Pennsylvania v. Glickman,* 370 F.Supp. 724 (W.D.Pa.1964).

These three cases just do not support the broad proposition advanced—that a state, without more, has *parens patriae* standing in federal court to redress any violation of the fourteenth amendment. In two instances the analysis is as conclusory as the proposition itself, *Flaherty* at 1024, *Glickman* at 727–728. In the third instance, *parens patriae* standing was sustained not because of fourteenth amendment considerations, but because of the traditional standing accorded to a state when charitable trusts are involved, *Brown* at 338.

In *Glickman,* the district court simply held, without analysis, that racial discrimination damages "the state's quasi-sovereign interests—defined generally as the health and welfare of its citizens." *Id.* at 728. It is impossible to tell from the opinion whether the Commonwealth had alleged or indeed had proved or established its quasi-sovereign interest.

In *Flaherty* the district court found the Commonwealth to be a proper party to challenge a discriminatory hiring practice. Again, the opinion is silent as to the Com-

---

**8.** Pennsylvania's population for the year 1979 was provisionally estimated as 11,721,000 by the Bureau of the Census. Bureau of Census, provisional estimate, 1979. The World Almanac and Book of Facts 695 (1981).

monwealth's allegations or proofs to sustain *parens patriae* standing and indeed the court's discussion of standing was even more summary than that found in *Glickman. Id.* at 1024.

*Brown*, as indicated, concerned Girard College, a charitable educational institution. The district court properly held that under Pennsylvania law, the Commonwealth had the duty, as *parens patriae*, to oversee the operation of charitable trusts which, by their very nature, lack beneficiaries with interests definite enough to enable them to sue for themselves. Significantly, Chief Judge Lord of the Eastern District of Pennsylvania, before whom *Brown* was tried, and who held that *parens patriae* standing was available in the *Brown* context, denied *parens patriae* standing in *Commonwealth of Pennsylvania ex rel. Rafferty v. Philadelphia Psychiatric Center*, 356 F.Supp. 500 (E.D.Pa.1973).

In *Rafferty*, the Commonwealth brought suit under §§ 1981 and 1983, alleging that the employment of Ms. Rafferty had been unconstitutionally terminated by the Philadelphia Psychiatric Center because she had publicized her criticism of patient care and conditions at the Center. Judge Lord, in addressing the standing of the Commonwealth, refused to accept the Commonwealth's argument that "its desire for a free flow of information critical of state-operated mental health programs is a quasi-sovereign interest which may properly be asserted in a *parens patriae* action." *Id.* at 506. He distinguished *Commonwealth of Pennsylvania v. Brown*, to which we have adverted above, because there he had found standing in an across-the-board context. In *Rafferty*, he concluded that the discharge of Ms. Rafferty constituted injury to her alone—an injury in which the Commonwealth had no separate interest. In so concluding, Judge Lord wrote:

> However, although to have standing as *parens patriae* a state need not be affected by the acts of the defendants in the same way that an individual plaintiff must be, it nevertheless must be able to show (i) that a substantial number of the

state's inhabitants have been injured, and (ii) that the state's injury is somehow separate and distinct from the injury to the individual plaintiff. Note, 18 Vill.L. Rev. 79 (1972). We think the Commonwealth has shown neither here.

*Id.* at 505.

Thus the broad statement that a state, without more, may bring a *parens patriae* action in federal court to enforce the fourteenth amendment has no analytical precedent to support it. Of greater import, for my purposes, those cases provide no exception to the *parens patriae* standard which requires that for *parens patriae* standing to exist, the state must allege and prove a community-wide burden on the one hand, and on the other, the state must demonstrate that it is not prosecuting the action to vindicate a personal claim of a citizen.

#### B.

In an effort to bolster its *parens patriae* standing, the argument has been made, not by the Commonwealth in its pleadings, and not by the Commonwealth in its proofs, but rather in Judge Gibbons' separate opinion, that the Commonwealth has standing because it must bear the cost of Baranyai's abuse of Millvale citizens. Op. of Gibbons, J., at p. 315 *ante.* The argument proceeds as follows: the fourteenth amendment is the law of the land; the Commonwealth has an interest in seeing to its compliance; therefore the Commonwealth is interested in preventing the police officers hired by its many municipalities from violating that amendment; misconduct of local government officials undermines public confidence; misconduct by local officials interferes with the obligations of executive officers of the Commonwealth in upholding fourteenth amendment rights; and that, therefore, the burdens of enforcement imposed upon the Commonwealth will divert its resources from other tasks. Furthermore, the Commonwealth is interested in safeguarding the health and safety of individuals in Pennsylvania, the cost of which is ultimately borne by the Commonwealth. Op. of Gibbons, J., at p. 315 *ante.*

Aside from this attenuated logic and questionable reasoning, none of which has record support, my difficulty with these naked assertions are that they have never been formulated, alleged, proved, or even made by the Commonwealth. They do, however, appear in Judge Gibbons' separate opinion.

As further justification for the Commonwealth's status in this action, Judge Gibbons reasons that the Commonwealth should not be obliged to rely on individuals bringing their own actions to redress violations of their own constitutional rights, but rather the Commonwealth should be accorded special status as a plaintiff.

First, he states that individual victims may be unable to demonstrate a likelihood of future violations and thus they may be relegated to damage actions only. Second, he hypothesizes that the burdens of showing a pattern or practice of police misconduct are substantial and may not be within the resources of individual victims. Third, he suggests that there may be a fear of intimidation or retribution which may deter private enforcement actions. He therefore concludes as a result of the hypothetical costs that he has postulated, and as a result of the inabilities, burdens and fears that individuals may have, that the Commonwealth has advanced a significant quasi-sovereign interest of its own in this action. That interest is characterized as an interest in preventing future violations of constitutional rights of the Commonwealth's citizens in circumstances "in which [the Commonwealth] cannot reasonably anticipate that private enforcement will achieve the protection of those sovereign interests." He concludes by stating: "Any description of a parens patriae remedy, even the narrowest, includes the state of facts alleged in the Commonwealth's Complaint." Op. of Gibbons, J., at pp. 315–16 *ante.*

Unfortunately, the Commonwealth has never made these arguments in this case.

Nothing appears in this case, or in this record, with respect to the Commonwealth's costs, which it is asserted, must be borne by the Commonwealth when, and if, future violations occur. Nothing appears in this case, or in this record, with respect to the undermining of ". . . the fiscal status of the Commonwealth's municipal creatures by exposing them to liabilities which can only be satisfied from tax revenues." Op. of Gibbons, J., at p. 315 *ante.* No allegations, let alone proof of the Commonwealth's fiscal status or its municipalities' exposure can be found in this Complaint, in this record, or in this case.

I do not understand that a plaintiff's standing may be upheld merely because an appellate court, without allegations or proof, constructs a scenario which, *if alleged and proved*, would support standing.[9] I have always believed that a plaintiff must allege the facts on which his standing is predicated and, if challenged, must establish those facts by evidence. This court so held in *Marchezak v. McKinley,* 607 F.2d 37 (3d Cir. 1979). Indeed, in that case, one theory of standing was presented for the first time at the appellate level, and the court promptly rejected that attempt to bypass the district court. *Id.* at 41.

Nor are the requirements for allegations and proofs different with respect to *parens patriae* standing. In *Commonwealth of Puerto Rico v. Alfred L. Snapp & Sons,* 632 F.2d 365 (4th Cir. 1980), the court noted three factors which normally determine whether there is a quasi-sovereign interest to support standing: "The size of the segment of the population that has been adversely affected, the magnitude of the harm inflicted, and the practical ability of those injured to obtain complete relief without intervention by the sovereign." *Id.* at 369. In that case the district court found that the size of the segment of the population and the injury to the Puerto Rican

---

**9.** By this statement, I do not mean to indicate that if indeed the Commonwealth had alleged and proved (if it could) the many circumstances which Judge Gibbons has recounted, that I would hold them to be sufficient to establish *parens patriae* standing in this case. In my opinion, such allegations and proof would still not meet the stringent requirements of *parens patriae* standing which I have discussed in section II.

economy were insufficient to warrant *parens patriae* standing. The court of appeals reversed, but the significant aspect of that case for our purposes is that, in reversing, the court of appeals rejected the district court's reasoning but only after a thorough analysis of the factual allegations that had been made to support Puerto Rico's *parens patriae* claim. The court accepted those allegations as true because it was reviewing the dismissal of the complaint on a 12(b) motion. *Id.* at 367.

In *State of Missouri v. National Organization for Women, Inc., supra,* the State of Missouri claimed *parens patriae* standing, alleging substantial injury to its economy and prosperity by reason of a convention boycott. The court undertook to analyze the evidence in support of this claim. The cancellation of convention bookings, the approximate revenue loss of $8.6 million, economic testimony by an expert, the effect upon hotels, restaurants, and the lead time requirement for national conventions, etc., were all thoroughly examined. The issue then became whether, considering all of the evidence, an economic injury had been suffered by the State of Missouri sufficient to confer upon the state standing as *parens patriae.*

It is thus apparent that in order to satisfy the stringent requirements of *parens patriae* standing, at the least, allegations of the quasi-sovereign interest involved must appear. And, where standing is controverted, *e. g.,* on the grounds that the state is seeking to represent individual rather than state-wide interests, evidence must be produced to support any findings that *parens patriae* requirements have been met. *Land O'Lakes Creameries, Inc. v. Louisiana State Board of Health,* 160 F.Supp. 387 (E.D.La. 1958) (3 judge court); *State of Missouri v. National Organization for Women, Inc., supra,* at 297–98.

Here, however, the Commonwealth has neither alleged, nor demonstrated by evidence, any quasi-sovereign interest. It has not proved that such an interest even exists. One can search the complaint in vain for even the barest allegation of any such interest. None appears.

My position is a simple one. As a matter of law I have consistently maintained that the Commonwealth has not met the two established criteria for *parens patriae* standing. It has not demonstrated a quasi-sovereign interest, and it has not demonstrated that the relief which it seeks is not the same relief that individual plaintiffs could have, and indeed have, obtained. Over and above that deficiency, however, is the additional obstacle which the Commonwealth has not overcome. Assuming that the Commonwealth had appropriately pleaded the elements of *parens patriae* standing, it has failed in this case to establish or demonstrate, on this record by adequate evidence and proof, that the interests which it might assert are present. Even if the Commonwealth had alleged all of the elements leading to a quasi-sovereign interest which appear in the separate opinion of Judge Gibbons, it has failed to offer evidence to prove them.

I do not say, that given an appropriate record showing a state-wide involvement, a *parens patriae* suit could not be sustained. I would suppose, for example, that if the Commonwealth alleged that all of its policemen and state troopers had conspired or were conspiring to violate constitutional rights of citizens throughout the entire state, and if it offered proof to that effect, it might indeed have a quasi-sovereign interest which would enable it to bring a *parens patriae* action. Such is not the case here where the record is barren of any such state-wide claim.

Not only is there a complete and utter absence of allegations and proof to sustain *parens patriae* standing, but the additional theories attributed to the Commonwealth, as alternate bases for its standing, are flawed as well.

### C.

Judge Gibbons offers two additional theories which would permit the Commonwealth to maintain this action. He argues that 42 U.S.C. § 1988, which provides that state statutes may be looked to for vindication of

civil rights, would provide *parens patriae* standing for the Commonwealth in this case. *See* Op. of Gibbons, J., at p. 318 *ante* and *see id.* at n.19 for full text of § 1988. Even if the two Pennsylvania Common Pleas cases referred to in Judge Gibbons's opinion at page 317 in support of this conclusion were apposite, it is significant that the Commonwealth has never taken notice of them, for at no time has the Commonwealth asserted § 1988 in support of its standing contentions. Given the opportunity before the district court and before this court, at both the panel and *en banc* arguments, the Commonwealth invoked neither the Pennsylvania statutes which are found in Judge Gibbons' separate opinion nor 42 U.S.C. § 1988 as a basis for its standing.

Because I am reluctant to address this aspect of standing, without either briefing or argument by the parties, I think it is inappropriate for the court at this stage of this proceeding, to consider a theory never advanced by the Commonwealth, and therefore never addressed by the defendants in this case. This court refused to do so in *Marchezak, supra*, where a party presented a new theory for the first time in this court. Here, where the theory has not even been advanced by a party, I believe the court should follow its established practice and decline consideration.

Perhaps recognizing that *parens patriae* standing may indeed not be available to the Commonwealth, Judge Gibbons asserts a fall-back argument that the Commonwealth, at the least, should be recognized as an adequate class representative of the class of persons in Millvale who may be subjected to violations of their constitutional rights by Millvale policemen. Op. of Gibbons, J., at p. 319 *ante.*

My difficulty with this argument is that although it is characterized as an argument made by the Commonwealth, a review of the Commonwealth's briefs and record does not disclose that the Commonwealth at any time has ever argued that it may be an adequate class representative. Nor has the Commonwealth ever relied upon Fed.R.

Civ.P. 23(b)(2) for its standing. Thus, this theory suffers from the same defect as the § 1988 theory, in that both of them have seen the light of day for the first time in this court.

The only class action allegations or motions that appear in the record of this case are those brought by the individual plaintiffs (*see* Amended Complaint and Motions for Class Certification). In addition to the fact that the Commonwealth has never asserted, argued or briefed its standing as a class representative, an insurmountable obstacle would face it, if it ever sought to do so.

One of the prerequisites to a class action that the Commonwealth would have to establish is that the Commonwealth was a member of the class entitled to sue on behalf of all members of the class. It obviously is not. It has no claim typical of the claims of the class that it might seek to represent. Nothing appears of record in this case which could support a claim that the Commonwealth's constitutional rights had been violated by Baranyai. Had such a claim appeared, the Commonwealth would then be in a position of seeking to have its rights redressed under the protection of § 1983 which, as I have previously indicated, is not available to protect a state. It is my impression that Judge Gibbons agrees with that conclusion. Op. of Gibbons, J., at p. 314 *ante.* Moreover, if indeed the Commonwealth could satisfy this prerequisite of a class action, which it is apparent it cannot, then it would certainly be foreclosed from *parens patriae* standing because *parens patriae* standing requires that the state's interest be independent of and different from the interests of those individuals who are affected. For class certification the state would have to demonstrate just the opposite—an identity of interest with respect to the members it seeks to represent.

I suggest that the Commonwealth cannot have both similar and dissimilar claims and still be an adequate class representative. Undoubtedly, this explains why the Commonwealth itself did not seek to represent a class in this action.

Thus on any theory I find no standing available to the Commonwealth, under § 1983, under *parens patriae*, under § 1988, or under Fed.R.Civ.P. 23. Having concluded that the Commonwealth is not entitled to maintain this action as a plaintiff either on its own behalf or on behalf of its citizens, I turn to another aspect of this appeal: the liability of the Borough Council members.

### IV.

 To afford relief against the members of the Borough Council, the requirements of *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), must be satisfied. Thus, the officials' misconduct cannot be merely a failure to act. Such officials must have played an affirmative role in the deprivation of the plaintiffs' rights, *i. e.,* there must be a causal link between the actions of the responsible officials named and the challenged misconduct. *Id.* at 375–77, 96 S.Ct. at 606–07. As this court observed in *Lewis v. Hyland,* 554 F.2d 93 (3d Cir.), *cert. denied,* 434 U.S. 931, 98 S.Ct. 419, 54 L.Ed.2d 291 (1977), *Rizzo* "was aimed at the failure of plaintiffs to prove the existence of an unconstitutional policy or plan adopted and enforced by the official defendants. Throughout, the Court emphasized the complete absence of any causal link between the individual police officers' conduct and the responsible authorities. Mere invocation of the words 'pattern' or 'plan' did not suffice without this causal link." *Id.* at 98.

 As contrasted with the evidence and findings made by the district court which established a causal connection between Baranyai's conduct, and the Mayor's and Police Chief's ratification of that conduct, the findings made by the district court pertaining to the Borough Council are of a different character. The findings which implicate the Borough Council members are four in number:

(1) the district court found that the Council heard complaints against Baranyai at numerous monthly meetings;

(2) the Council failed to investigate the complaints;

(3) the Council took no action to deter Baranyai's illegal conduct or to discipline Baranyai even after it had been informed of his conviction for such acts in state court; and

(4) the Council passed two resolutions in support of Baranyai.

Thus, with respect to these four categories of findings, there are only two acts of the Council which demonstrate that the Council has "taken an active [i.e., an affirmative] part in the Baranyai affair," *Commonwealth of Pennsylvania v. Porter,* 480 F.Supp. at 702.

The first act to which the district court referred is the Council's adoption of a resolution on July 12, 1977 (Plaintiff's Ex. 15) which the district court characterized as "supporting Baranyai." The second act of the Council, to which the district court made reference, occurred on February 14, 1978 (Plaintiff's Ex. 12) when the Council adopted another resolution which the district court read as providing support to Baranyai. The conclusions drawn from these resolutions and from "the evidence" led the district court to hold that: (1) complaints to the Borough Council were useless and (2) that the Council had "failed to make any investigation or take any steps towards removing or suspending" Baranyai. 480 F.Supp. at 702.

I do not read the record in the same manner as the district court. The record does not reveal intentional acts (such as retaliation against witnesses) taken by the defendant Council members to further Baranyai's unlawful conduct. As I understand *Lewis* and *Rizzo,* the Council members' actions, unlike those of Police Chief Porter and Mayor McCarthy, fell within the category of actions that, under *Lewis* and *Rizzo,* do not constitute grounds for injunctive relief. *Lewis* held that a "mere *'failure* to act* [by responsible authorities] in the face of a statistical pattern' was found to provide no basis for injunctive relief," 554 F.2d at 98 (emphasis and bracketed material in original, footnote omitted). Here, of course, no statistical pattern is involved,

rather the gravamen of the charge against the Council members is that complaints were made, but no action was taken. However, *Lewis* also held that no evidence of the essential causal link existed where there was no more than "an unfortunate insensitivity on the part of responsible officials toward reports of abuses . . . ." *Id.* at 101.

Thus, while the evidence reveals that the Mayor and Police Chief actively supported and indeed encouraged Baranyai's conduct, the Council members' official actions constitute no more than inaction and insensitivity. The Council's first resolution did no more than "give Officer Baranyai [the Council's] support[,] [p]rovided that [it] is agreeable with the Borough Solicitor upon his review of the facts of the charges." Pl. Ex. 15. Seven months later the Council passed a "motion to continue to support Officer Frank Baranyai," Pl. Ex. 12, after he had been convicted of three misdemeanor counts in a state criminal prosecution based on many of the same incidents underlying the district court decision in this case.

This evidence does not satisfy the threshold requirements of *Rizzo* and *Lewis*. Nor does a review of the record reveal other evidence which is sufficient to warrant treating the Council members in the same fashion as the other defendants. Thus, Judge Gibbons' attempt to distinguish this case from *Rizzo,* p. 322 *ante,* is, in my view, particularly unsuccessful. I fail to see how the statutory duty of the Borough Council to control Baranyai is somehow more "affirmative" than the duty of Philadelphia's city officials to prevent civil rights violations by the Philadelphia police force.

In this connection, I am additionally troubled by the change in composition of the Borough Council.[10] The record discloses that only one of the Council members (Lawson) named as a defendant was in office at the time of argument, and he tried to have Baranyai removed as a police officer. His term has since expired. Two Council member defendants had completed their service in 1977, and two new Council members are not named as defendants. As the record appears, therefore, none of the seven named Council members would be appropriate defendants in an action seeking injunctive relief unless they had been reelected—a subject upon which the record is silent. Thus, to the extent that the plaintiffs have the burden of proving that injunctive relief is appropriate as to the named defendants, they have not met this burden.[11] Indeed, *Lewis* held when "none of the incidents proved . . . occurred under the regimes of the *incumbent* 'responsible authorities,'" that "any link between responsible officials and the incidents of abuse is necessarily more attenuated . . . ." 554 F.2d at 101 (emphasis supplied). Accordingly, as to the members of the Council, the *Rizzo* and *Lewis* standards have not been met, and the injunction, to the extent it is imposed on these defendants, should be vacated.

### V.

Not only do I differ from my colleagues with respect to the Commonwealth's status in this case as a plaintiff, but as I have explained, I also am convinced that the record does not support an injunction against the members of the Borough Council. These two conclusions lead me to believe that the appropriate jurisprudential action to be taken is a remand to the dis-

---

**10.** The injunction entered by the district court refers to all the defendants generally. To the extent, of course, that the injunction orders official action, it is obviously directed at the members of the Borough Council in their official capacity. However, it should be noted that the complaint sought relief against all defendants in their official *and* individual capacities and that paragraph 7 of the injunction leaves open the question of attorneys' fees and expenses. (See Appendix A for the complete order of the district court.) To affirm that order in the present posture of this case would appear to be inappropriate for this reason, as well as for the reasons discussed in part V, *infra*.

**11.** *Rizzo v. Goode,* 423 U.S. 362, 378 (1976), noted:

> Even in an action between private individuals, it has long been held that an injunction is "to be used sparingly, and only in a clear and plain case." *Irwin v. Dixion,* 9 How. 10, 33, 13 L.Ed. 25 (1850).

trict court so that it may redraw its injunction. In particular, I am concerned about the effect of the district court's order as it concerns the Borough Council members.[12]

First, it must be recognized that the entire injunctive order is outdated because Baranyai has left Millvale's employ and thus those portions of the order which address his employment and conduct are inappropriate. However, because it is this order which is on review before this court and which this court is affirming, I must address the provisions of the order as they appear.

Second, I note that the district court in framing paragraph 4 of its injunction, enjoined *all* defendants from "further engaging in [unconstitutional] conduct ... or participating in violations of this injunction by Baranyai." Since that order was entered, Baranyai, as we know, has left the police force in Millvale. Obviously, the district court intended this injunction to operate against the Borough Council members as well as against the other defendants, but as I have pointed out, the record fails to support an injunction against the Borough Council members. More significantly the membership of the Council is no longer the same. These circumstances raise serious questions apart from the issue of overbreadth, as to the implementation of this portion of the district court's decree.

Third, the first segment of paragraph 5 of the injunctive order apparently enjoins all of the defendants from employing Baranyai. This segment obviously suffers from the same defect as paragraph 4 insofar as it pertains to the Council member defendants. Moreover, because the Pennsylvania Borough Code apparently vests the authority in the Borough Council to remove borough policemen, only the current members of the Council, who are not named as defendants, have the capacity to comply if indeed the individual members, as distinct from the Council as an entity, may so act. The second segment of paragraph 5 which enjoins Baranyai from serving as other than an unarmed desk policeman appears to be inconsistent with the earlier direction that he not be employed at all. It can however, depending upon its punctuation, be read consistently so as to provide that all the defendants are enjoined from employing Baranyai as other than an unarmed desk officer, and that Baranyai is enjoined from serving as other than an unarmed desk officer. In favoring this latter construction, which avoids an improbable internal inconsistency, another question is raised as to the Council members' authority to assign or reassign police officers to particular duties under the Pennsylvania Borough Code. Whatever the correct interpretation may be, it is unquestionable, however, that the injunctive order must involve the exercise of the Mayor's delegable powers under the Pennsylvania Code and the assignment to particular duties by the Mayor and/or Police Chief.

This in turn implicates the constitutional principles referred to by the district court in its discussion of "Remedies," 480 F.Supp. at 703–04. The district court held the injunctive relief which it provided would not interfere with the daily internal workings of the police department in accordance with the teachings of *Rizzo*, 480 F.Supp. at 704. However, the district court reached that conclusion only after it had found *all* the defendants liable and therefore subject to injunction. As I have pointed out, however, the defendant members of the Council may not be enjoined, thereby casting some doubt on what injunction would have been imposed had the district court not found them liable.

Fourth, in addition to the problems presented by the terms of the district court's injunction and the circumstance that the Council members are outside its operation, still another substantial issue must be considered. In my opinion the Commonwealth should have been dismissed as a plaintiff. Its dismissal would leave open

---

12. The entire order of the district court dated November 16, 1979, is reproduced as Appendix A to this opinion.

the question of whether the individual plaintiffs are entitled to the relief they seek without class certification and, if not, whether a class should be certified. It must be remembered that the district court only denied class certification because it assumed that the Commonwealth was a proper plaintiff in this action.

In light of these unresolved problems, I believe it is a mistake for us at our appellate level to confront these issues and the tensions which they create. If a class is to be certified, obviously it should be the district court which in the first instance makes that determination and it should be that court which decides the contours of such a class.

If problems exist with respect to the terms of this decree, as I believe they do, it is for the district court to modify those terms so that the decree is internally consistent, and so that provision is made to accommodate our directions. Moreover, even though we have held that this appeal is not moot, it appears that recognition of the fact that Baranyai has left Millvale, must necessarily affect the form that the ultimate injunctive decree must take. Because of these considerations, I cannot agree that the injunction should be affirmed without having it redrawn by the district court. I would remand to the district court so that it may restructure the injunction in accordance with the rulings which this court has ordered.[13]

## VI.

Because in my opinion the Commonwealth has failed to establish its right to maintain this action as a plaintiff, I dissent from the court's opinion which holds otherwise. I also disagree with the court's judgment which does not remand this case to the district court for modification and refinement of its injunction, particularly since the record does not support the issuance of an injunction against the Borough Council's members. Unlike my colleagues I would also direct the district court to reconsider its rulings on class certification, if an appropriate application is made.

To the extent, therefore, that the Commonwealth is permitted status as a plaintiff in this action, and to the extent that no provision is made for reconsideration of a class action, and to the extent that the proceeding is not remanded to the district court—I dissent. To the extent that the court affirms the district court's findings with respect to Baranyai, the Mayor and Police Chief and thus the propriety of injunctive relief as to those defendants—I concur.

## APPENDIX

### ORDER

AND NOW, to wit, November 16, 1979, on the basis of the evidence presented in this case and upon due consideration of the briefs and arguments of counsel and the court finding that the evidence shows that there is a continuing course of conduct on the part of the defendants which violates the constitutional rights of plaintiffs and those individuals they represent and that an injunction is necessary against defendant Baranyai and the other defendants requiring that Baranyai perform the duties of a police officer in a constitutional manner

---

**13.** In the restructuring of its injunction, I would permit the district court to exercise its own discretion as to whether it requires supplemental hearings and a supplementary evidentiary record.

Additionally, even though I would dismiss the members of the Borough Council as defendants in this action, because the present record does not support relief against them, it may be necessary for the district court in redrawing its injunction to require actions to be taken by the Council. Nothing that I have said with respect to the named Council members and the unavailability of injunctive relief against them on this record, should prevent the district court from fashioning adequate relief with respect to proper parties, if in its findings and discretion it holds such relief to be appropriate. Nor would I restrict the plaintiffs from either seeking to supplement the record or from attempting to restructure their action in light of our actions (see *Monell v. New York City Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)), subject always to the district court's discretion.

and that the other defendants should be restrained from aiding, abetting, encouraging his conduct or ratifying or participating in the same, for reasons set forth in the accompanying opinin [sic],

IT IS THEREFORE ORDERED that:

(1) A permanent injunction is hereby issued against the defendant Frank L. Baranyai and all persons acting in concert with him enjoining him from (a) stopping, arresting or imprisoning plaintiffs or other individuals without adequate probable cause, (b) physically abusing or otherwise treating plaintiffs or other individuals, (c) using wrongful or excessive force while bringing about lawful arrests or in otherwise handling individuals arrested after they have been secured in custody.

(2) The defendant Baranyai together with the defendants James D. Porter, Chief of Police and Regis J. McCarthy, Mayor of the Borough of Millvale, Allegheny County are enjoined and restrained from harassing, threatening, intimidating or retaliating against the plaintiffs or other individuals in violation of their First and Fourteenth Amendment rights of speech[,] assembly and association and the right to equal protection of the laws and their constitutional right to travel for lawfully complaining against the conduct of defendant Baranyai or testifying at trials or hearings involving his conduct.

(3) The defendant Baranyai is restrained from stopping, seizing and searching plaintiffs or other individuals on the streets whether in the Borough of Millvale or elsewhere, in their homes or otherwise without adequate cause in violation of their First and Fourteenth Amendment rights and [sic] to freedom from unreasonable searches and seizures and in violation of their rights not to be deprived of property without due process of law.

(4) All of the defendants are enjoined from further engaging in conduct as enjoined above or from encouraging, affirming, or participating in violations of this injunction by Baranyai.

(5) All of the defendants are hereby enjoined effective 5 days from the date of this order from employing defendant Baranyai and Baranyai is enjoined from serving as a police officer or law enforcement official on any basis in the Borough of Millvale except as a desk policeman whose activities shall be entirely confined to the police station of the Borough of Millvale and he is further enjoined from possessing or using upon prisoners or other persons any weapons of any kind, particularly without limiting the generality of the foregoing any blackjack, nightstick, firearm of any kind, brass knuckles or any other offensive weapon so that his activities with the Millvale Police Force shall be entirely confined to desk duty and in the course of such duty he shall not be permitted to use any weapons of any kind upon prisoners or other persons.

(6) The court will retain jurisdiction of this case for the purpose of issuing further orders to insure that the requirements of this order be carried out.

(7) If plaintiff's counsel have any claim for attorney's fees and expenses they shall present the same properly itemized and verified to this court within 20 days from the date of this order following which the court will, if necessary, hold further hearings with respect to the same.